59 So.2d 779 (1952)
STATE et al.
v.
TOWN OF NORTH MIAMI.
Supreme Court of Florida, en Banc.
June 20, 1952.
*780 Glenn C. Mincer, Miami, for appellants.
John H. Wahl, Jr., Miami, for appellee.
MATHEWS, Justice.
This appeal is from a decree validating so-called certificates of indebtedness to be issued by the Town of North Miami.
The Town of North Miami received no special charter from the Legislature but was organized pursuant to the provisions of Chapter 165, F.S.A., as amended. No special or extraordinary powers have been conferred upon the Town by the Legislature and it has only such powers as are expressly enumerated in Chapter 165, F.S.A., and particularly, Section 165.08 F.S.A.; namely, "to take and to hold property, real, personal and mixed, and to control and dispose of the same for the benefit and best interest of the corporation * * * to sue and be sued, plead and be impleaded, and to do all such other acts and things as are incident to corporate bodies."
Chapter 165, F.S.A., relates to the organization, powers, duties and privileges of cities and towns, or municipal corporations, and not to private corporations which are authorized to be organized by other statutes.
The certificates are to be issued by the Town without submitting to the freeholders of the Town the question of their issuance. The monies realized from the sale of the certificates are to be used to purchase certain lands lying within the corporate limits and to erect an aluminum manufacturing plant upon the property thus acquired. The property is then to be leased for the term of 20 years to a private corporation under an agreement whereby such private corporation will carry on a manufacturing enterprise for private profit upon the premises. The certificates will recite that the indebtedness evidenced thereby does not constitute a corporate indebtedness of the Town and that the Town is not obligated to pay the principal of or interest on the certificates except from the net revenues derived from the rental of the building to the private corporation.
By the terms of the proposed lease the private corporation is obligated to maintain and keep the building fully insured and is to pay an annual rental so calculated that when paid over the term, the rents will have fully amortized the principal amount of the certificates and the interest thereon, which will have been sold and issued to obtain the necessary funds to pay all costs incident to the issuance of the certificates of indebtedness, their validation and sale, as well as the cost of acquiring the land and constructing the building thereon.
Section 16 of the proposed lease provides, among other things:
"As a part of the consideration for the execution of this lease by the Company, the Town hereby gives to the company an option * * * to * * * renew this lease for an additional term of twenty-five * * * years, the cash rental per year during said additional term to be the sum equal to the taxes that would be due the Town if the building were privately owned. * * * The Company is hereby granted an additional option to purchase from the Town the fee simple title of the land and buildings covered by this lease agreement, at any time during the life of this agreement, or at any time during the life of a renewal lease. Such option to purchase may be exercised by payment to the Town of North Miami the sum of One Thousand and 00/100 Dollars * * * plus an amount necessary to pay in full at their respective redemption prices, including interest, all of said Industrial Building Revenue Certificates which may be outstanding at the time the option is exercised."
Section 17 of the proposed lease provides, in part:
"The parties recognize that the land and improvements covered by this lease, so long as title thereto is vested in the Town, are and will be exempt *781 from taxation by the State or other political subdivision thereof. If, as the result of any judgment or decree by a court of competent jurisdiction, it is held that such taxes may be imposed, then, and in such event, in addition to the rental elsewhere specified in this lease to be paid by (the) Corporation, the Company will pay the Town as additional rental a sum equivalent to the amount of any such taxes so assessed for each year assessed. * * *"
At the time of the rendition of a final decree validating the certificates the Court also entered an opinion and order, which in part reads as follows:
"* * * the Court has considered each question raised by the Complaint and the Motion to Dismiss and finds that there is merit to the position taken by the Town in the preamble to the Resolution (Exhibit A), and that the certificates authorized to be issued by said Resolution will be issued for a municipal purpose.
"It further finds that because the proposed certificates will not pledge the general credit of the Town but, on the contrary, are to be paid solely and exclusively from the revenue to be derived from the rental of the premises, there is no requirement that they be approved by an election pursuant to Section 6 of Article IX of the Florida Constitution, F.S.A.; that said self-liquidating revenue certificates, when issued, will not constitute a loan or pledge of the credit of the Town to an individual, Company, corporation or association as prohibited by Section 10 of Article IX of the Florida Constitution; and that the Town has full power and authority to issue, validate and sell such certificates for the purposes and in the manner recited in the authorizing Resolution.
"It is apparent that the Town, by acquiring the lands involved, building thereon a building useful for manufacturing purposes, there being no other suitable buildings available in the Town, and leasing the building, when complete, to a manufacturing industry, that the Town and its citizens will enjoy benefits flowing from the employment of several hundred citizens of the Town."
The appellant presents three questions on the appeal:
1. Does the Town of North Miami, a municipal corporation organized and existing under the general statutes, have the power and authority, and is it a proper municipal purpose, for it to purchase land, erect an industrial building thereon and thereafter lease the premises to a private corporation with the rental revenues thus to be derived pledged for the payment of securities issued by the Town to provide the proceeds with which to acquire the land and building?
2. Is there a violation of the constitutional prohibition against the lending of credit (Article IX, Section 10, Florida Constitution) involved in the proposal by the town of North Miami to acquire an industrial building by issuing certificates of indebtedness and thereupon renting the building to a private corporation, with the rental revenues pledged as the security for the payment of the certificates?
3. Can the Town of North Miami, without an approving election by the freeholders, issue certificates of indebtedness for the payment of which it pledges the revenues to be derived from rentals received from an industrial building to be acquired with the proceeds of such certificates?
We should first decide if the purchase of the land for the specified purpose of erecting a manufacturing plant and the erection of such plant by the municipality for the purposes set forth in the resolution and the proposed lease, will serve a municipal purpose. If the execution of the proposed plan will serve a municipal purpose, then within certain limitations, the Town would have the authority to issue certificates of indebtedness to accomplish the purpose.
The power and authority which the Town has by reason of Section 165.08, F.S.A., "to take and to hold property, real, *782 personal and mixed, and to control and dispose of the same", carries with it the necessary limitation that the same shall be for a municipal purpose.
38 American Jurisprudence, Municipal Corporation, Sec. 484, pages 162 and 163, states:
"* * * For the purpose of carrying on such activities as are intrusted to them, municipal corporations are usually given the power to acquire, hold, and manage real and personal property. In some states, municipal corporations are expressly authorized to acquire and hold real and personal property for corporate purposes. * * *
"Charter authority to purchase and hold property of all kinds relates, unless otherwise expressed, to such property only as is needed for municipal purposes. As a general rule, a municipal corporation has no authority to purchase and hold property for a purpose disconnected with a public use, for that would amount to expending public funds for a purpose which is not public. * * *"
Before entering into a discussion of law with reference to these questions, we deem it advisable to briefly analyze the terms of this proposed lease. It is to be for a term of 20 years and the rental which the private corporation shall pay to the Town will be so calculated that the rental paid over the 20-year period will amortize the principal and interest of the certificates of indebtedness, and at the end of 20 years, the land and the building will be entirely paid for and ownership will be vested in the Town free and clear of any indebtedness.
Section 16 of the proposed lease grants to the private company an option to renew the same for an additional term of 25 years. It then provides that the rental per year during the said additional 25 years shall be only a sum equal to the taxes that would be due the Town if the buildings were privately owned. In other words, the Town binds itself to lease the property, which would have cost $400,000, to this private corporation for no more than the taxes would be if it was owned by the private corporation.
It is also significant to note that this same section of the proposed lease grants to the private corporation an additional option to purchase the fee-simple title to the property at any time during the life of the agreement, or any renewal thereof, for the sum of $1,000 plus an amount necessary to pay in full at their respective redemption prices, including interest, all of the revenue certificates that may be outstanding at any time the option is exercised. In other words, if the private corporation carried out the terms of the lease and paid the rentals due for the first 20 years, there would be no outstanding certificates of indebtedness. At such a time the Town would be obligated to sell this property, which had cost $400,000, to the private corporation for only $1,000.
The appellee has cited many cases which it claims supports its contention and the opinion of the Chancellor that the issuance of these proposed certificates will serve a municipal purpose.
The case of Bailey v. City of Tampa, 92 Fla. 1030, 111 So. 119, is not a case in point. In that case the City was specially authorized by the Legislature in and by Section 2 of Chapter 5546, Acts of 1905, to "`sell, contract for the sale of or lease any or all of the properties acquired by the city of Tampa for park purposes * * for the benefit of the city of Tampa'." By the terms of an agreement made with the City, the Tampa Board of Trade agreed to erect an office building costing not less than $400,000, without any expense or obligation to the City. If further agreed that when the mortgage issued against the building for the erection of the building was discharged, the liquidation to be not later than 35 years from the execution of the agreement, it, the Board, would reconvey the land, with the building thereon, to the City, free from any indebtedness; subject only to the right of the Board of Trade to use a portion of the building and premises in carrying out the purposes for which the Board was "organized and operated consistent with the public interest." There was a proviso in the agreement that *783 the contract should not become effective until ratified by the qualified electors of the City. The record in the case discloses that the agreement was ratified by a majority of the electors at an election held for that purpose.
The case of State v. City of Tallahassee, 142 Fla. 476, 195 So. 402, is not analogous to the situation now before us. In the Tallahassee case there was specific legislative authority and determination that the erection of an office building in the Capital would serve a public purpose. Tallahassee is the Capital of the State. Offices must be provided for state officials, commissions and boards to carry on the functions of state government. The erection of the building in question served not only a state purpose but also a municipal purpose, and all of the purposes of this office building were public purposes. What everyone knows, the Court knows. Prior to the erection of this office building, the State was paying rent for office space in buildings scattered all over Tallahassee. After the erection of this building in the vicinity of the Capital Center, space was rented to the State and under the terms of the contract, the rentals from this building have now retired all of the indebtedness and the building is now the property of the State. The State is not a corporation within the meaning of Sec. 10 of Article IX of the Constitution.
The case of City of Fernandina v. State, 143 Fla. 802, 197 So. 454, 456, is strongly relied upon by the appellee as authority that the acquisition of this land and the erection of the manufacturing or industrial building will serve a municipal purpose. In that case the City of Fernandina had employed one O.H. Anderson to render certain services in bringing about the location of two pulp and paper mills in the City. The services were performed by Mr. Anderson and by reason thereof, the mills were induced to locate in Fernandina. Two contentions were involved: (1) that the payment of the fee would involve tax money and that Section 5 of Article IX of the Constitution prohibited the City from imposing taxes for other than municipal purposes, and (2) that the contract with Anderson indirectly violated Section 10 of Article IX of the Constitution, which prohibited the City from becoming a stockholder in or loaning its credit to any corporation or association. In that case the Court pointed out that special charter powers granted by the Legislature authorized the contract in question. The Court said:
"It therefore appears that the City Commission, the legislature and the people of Fernandina considered the expenditure of the funds in question as being for a municipal purpose. This Court has approved expenditures by the municipality for advertising purposes, golf courses, city office building, air base and in Smith v. Daffin et al., 115 Fla. 418, 155 So. 658, 796 and again in Smith v. Jackson County, 129 Fla. 787, 176 So. 858, we approved a contract very similar in many aspects to the one brought in question. In view of this support for the instant contract, we would not be authorized to strike it down unless clearly shown to be outside the pale of the constitution."
In the Fernandina case the City did not buy the land and did not erect the building or own any stock in the corporation or lend its credit or property to the corporation.
It has long been the practice and custom and the public policy of this State to advertise the advantages of the State to the world in an effort to induce new people and new capital to come into the State. Such programs of advertising for municipalities and counties have been specifically authorized by the Legislature from time to time. As noted above, the Legislature had specifically authorized the City of Fernandina to enter into an advertising program; and the electors of the City had given their approval to this specific expenditure. Such programs are for the benefit of all the people of the governmental unit affected and not simply for the benefit of a private corporation operated for private profit or gain.
State v. Dade County, 157 Fla. 859, 27 So.2d 283, was a recognition by this Court *784 that air transportation was one of the great innovations of the age, that Miami was potentially one of the greatest air transportation points in the world, and that Florida is a port of entry for air transportation from South and Central America, the West Indies and Africa. The airport in question was to be publicly owned and publicly operated and it is recognized that air transportation, such as that flowing into and out of Miami, serves a real public purpose, and in developing this port, owning and operating the same, it could not be said that the City of Miami was not serving a public and municipal purpose.
Buchanan v. City of Miami, Fla., 49 So.2d 336, was a case where the construction and operation of a sewage disposal plant was conceded by all parties to be a governmental function.
In the case of State v. Escambia County, Fla., 52 So.2d 125, the land had been deeded by the United States Government for "public purposes". There was a special act authorizing the issuance of revenue certificates to accomplish the development of recreational projects on the beaches of Santa Rosa Island for the public benefit. Beaches are generally considered public and in that case the authority was granted by the Legislature for the construction of facilities on the beaches for recreational purposes and this Court held the same to be for a public purpose. There was no suggestion in that case that the beaches were to be acquired and developed for the use by private corporations for private profit or gain.
In the case of State v. City of Jacksonville, Fla., 53 So.2d 306, 307, a special act authorized the City to acquire real estate for extension of recreational facilities. The dominant question in that case was whether or not the acquisition of such real estate and the issuance of certificates of indebtedness was for a municipal purpose. In an opinion by Mr. Justice Terrell this Court held that the special act was valid and that the acquisition of the land and the issuance of the certificates of indebtedness served a municipal purpose. In the opinion it was said:
"* * * Athletic sports have long been required as part of the public school and community program and they are being provided everywhere. In some institutions of higher learning credit for degree is given in sports. What the city is proposing here is in harmony with municipal and community programs in every progressive locality and are generally approved.
"In addition to the foregoing but no doubt actuated by said observations, State and City legislatures have found that recreational facilities are proper subjects for the expenditure of public funds. It is a proper exercise of legislative power and so long as reasonable and in the range of legislative ambit this court is without power to strike it down."
We have gone at some length to discuss and distinguish some of the cases so strongly relied upon by the appellee. This Court has approved special acts of the Legislature authorizing advertising programs, the acquisition of land, for golf courses, parks, playgrounds and recreational and hospital centers. The Court has also approved special acts authorizing the construction of buildings which served a public purpose and many other acts authorizing counties and municipalities to acquire property and make improvements to public property which served a public purpose. In none of the cases decided by this Court since the adoption of our present Constitution have we approved any special legislative acts which authorized any of the political subdivisions or governmental units of the State to acquire property and erect buildings thereon for the exclusive use of a private corporation for private gain and profit.
Every new business, manufacturing plant, or industrial plant which may be established in a municipality will be of some benefit to the municipality. A new super market, a new department store, a new meat market, a steel mill, a crate manufacturing plant, a pulp mill, or other establishments which could be named without end, may be of material benefit to the *785 growth, progress, development and prosperity of a municipality. But these considerations do not make the acquisition of land and the erection of buildings, for such purposes, a municipal purpose.
Our government was founded upon the firm foundation that private property cannot be taken except when it will serve a public purpose. Section 1 of the Declaration of Rights of the State Constitution provides, that, "all men * * * have certain inalienable rights, among which are those of * * * acquiring possessing and protecting property * * *." If private property may be purchased by the municipality for the use and benefit of a private corporation, then it may be acquired by the great power of eminent domain for such a purpose. A first essential for the acquirement of private property by this great power is, that it shall be for a public purpose. See Peavy-Wilson Lumber Co. v. Brevard County, 159 Fla. 311, 31 So.2d 483, 172 A.L.R. 168.
Our organic law prohibits the expenditure of public money for a private purpose. It does not matter whether the money is derived by ad valorem taxes, by gift, or otherwise. It is public money and under our organic law public money cannot be appropriated for a private purpose or used for the purpose of acquiring property for the benefit of a private concern. It does not matter that such undertakings may be called or how worthwhile they may appear to be at the passing moment. The financing of private enterprises by means of public funds is entirely foreign to a proper concept of our constitutional system. Experience has shown that such encroachments will lead inevitably to the ultimate destruction of the private enterprise system.
We have called particular attention to the fact that in the cases cited by the appellee there was a specific legislative determination that the purpose was a public, county, or municipal purpose, as the case happened to be, and that there was no such legislative determination in this case. By so doing, we do not mean to hold or imply that had there been such a legislative determination, the certificates of indebtedness would have been valid. There are certain limits beyond which the Legislature cannot go. It cannot authorize a municipality to spend public money or lend or donate, directly or indirectly, public property for a purpose which is not public. A legislative determination may be persuasive, but it is not conclusive.
In McQuillin, Municipal Corporations, 2d Ed., Vol. 6, Sec. 2436, pages 147 and 148, the author states:
"In order to determine whether a municipality has power to issue bonds, it is first necessary to ascertain if any statute or charter provision exists in regard thereto. If there is such a provision, the question arises whether it is applicable to the particular municipality and whether the purpose of the proposed bond issue is within the terms of such provision. If the statute is applicable, it must further be considered whether the purpose of the issue is a public as distinguished from a private purpose. If the purpose is purely a private one, there is no power to issue, without regard to the existence of any statutory or charter provisions, since even the legislature cannot authorize the issuance of bonds for a purely private purpose. * *"
In McQuillin, Municipal Corporations, 2d Ed., Vol. 5, pages 1298 and 1299, the author states:
"Unless the power so to do has been expressly delegated by the legislature, a municipality has no power to donate money, issue bonds, subscribe to stock, or otherwise aid a private corporation, * * * and this is so notwithstanding the municipality may be incidentally benefited by the location of the company in the municipality or otherwise. This includes * * * aid to manufacturing plants; * *".
In 63 C.J.S., Municipal Corporations, § 958, page 507, the author states:
"A municipality lacks power or authority to purchase or otherwise acquire or hold property for a purpose not within the powers specifically conferred *786 on it or essential to carry out the objects of its creation, and it has been held that an ordinance appropriating property for a public purpose must set out the particular purpose so that the courts may judge as to whether or not it is a public purpose within the contemplation of the law. As a rule, a municipal corporation cannot purchase property in aid of any private enterprise, however laudable its purpose or useful its encouragement."
In the opinion by Mr. Justice Terrell in the case of Bailey v. City of Tampa, supra, it was pointed out that Section 10 of Article IX of the organic law was first adopted in 1875 as an amendment to Section 7 of Article XIII of the Constitution of 1868. It was also said that the reason for this amendment was that during the years immediately preceding its adoption, the state and many of its counties, cities and towns had by legislative enactment become stockholders or bondholders in, and had in other ways loaned their credit to, and had become interested in the organization and operation of, railroads, banks, and other commercial institutions. It was stated that the essence of the amendment was "to restrict the activities and functions of the state, county, and municipality to that of government, and forbid their engaging directly or indirectly in commercial enterprises for profit." [92 Fla. 1030, 111 So. 120.]
In the case of Brumby v. City of Clearwater, 108 Fla. 633, 149 So. 203, 204, the City of Clearwater attempted to spend public funds for the purpose of dredging a channel and basin for the use of an individual to carry on and maintain a private business. The Court held in an opinion by Mr. Justice Buford that the contract was void because the City of Clearwater was without authority to "undertake the expenditure of public funds" for such a private business. The Court further held:
"* * * the contract is also void because by its terms the city attempted to finance a private business enterprise for the use and benefit of an individual by undertaking to provide and furnish the major portion of the facilities for conducting such enterprise under the terms and conditions that the cost of such facilities should be reimbursed to the city by the individual for whose benefit the same was proposed to be furnished in monthly installments extending over a period of years. This contravenes the provisions of section 10 of article 9 of the state Constitution, because the contract clearly required the appropriation of public money for the individual benefit of the appellant and to provide the facilities required for the conducting of his private business enterprise.
"The fact that the contract refers to the enterprise as a public utility cannot make it such. All the terms of the contract show that its purpose was to provide facilities for the operation of a private business for individual profit. The contract was void from its inception and neither party acquired any rights under it. Section 10, article 9, Constitution of Florida."
The case of City of Bradenton v. State, 88 Fla. 381, 102 So. 556, 36 A.L.R. 1297, was a suit to validate bonds issued by the municipality, the proceeds of which were to be used for the enlargement and maintenance of a golf course in the City of Bradenton, for the benefit of a private golf club which was a chartered company. The Court, speaking through the late Mr. Justice Whitfield, held that although the City may have the power to purchase and maintain a golf course, owned by the City, maintained by the City, and operated impartially in the interest of the local public by the City, it could not use the proceeds for the purpose intended, for the benefit of a private golf club, because to do so would be in plain violation of Section 7 of Article IX of the Constitution.
In the case of City of Daytona Beach v. King, 132 Fla. 273, 181 So. 1, 4, in an opinion by Mr. Justice Chapman it appears that the City had entered into a contract with the owner of a golf course for the erection of a club house and improvements to the golf course so that citizens and visitors to the City for a reasonable fee could be admitted and the City would materially *787 benefit. Most of the cases decided by the Court on this question prior to that time were either cited or discussed in the opinion. In the course of the opinion Mr. Justice Chapman stated:
"* * * If the taxpayers' money can be diverted and used to finance a private golf course, why not take a further step and finance a private billiard parlor, a private dance hall, a private baseball team, a private `Jook,' or set up a private drug store or private automobile business."
There is no similarity between this case and those where the Legislature authorizes a municipality to establish a sewage system, a water system, an electric light plant, or to furnish some other public utility or service essential to the welfare of all the people of a municipality; or for the exercise of the police power for slum clearance, or for the removal of blighted areas, or some such other undertaking for the protection and conservation of the public health, or to eliminate crime-breeding places or to conserve the morals, or protect the lives and limbs of the people.
This is simply a case where the municipality is attempting to use the power of the municipality to purchase land and erect industrial or manufacturing plants thereon for the use of a private corporation for private profit and private gain. Should the certificates be sold, the money derived therefrom would belong to the Town and would be public funds.
We hold that the proposed certificates of indebtedness and the lease are void because: first, the proposal to attempt to use the power of the municipality and the proceeds from the certificates of indebtedness to purchase land and erect an industrial or manufacturing plant thereon for the use of a private corporation for private profit and gain does not serve a public or municipal purpose, and, second, Section 10, Article IX of the Constitution provides: "The Legislature shall not authorize any * * * city * * * to obtain or appropriate money for, or to loan its credit to, any corporation * * *." Manifestly, the project in question could not have been legally authorized by the Legislature, and certainly the power of the Town of North Miami, in the matter, could not be extended to the exercise of a power which the Legislature could not validly confer. Hence, the project contemplated is in plain violation of the spirit and letter of Section 10, Article IX of the Constitution.
Having reached the conclusion which we have, it is unnecessary to discuss or decide other questions in this case.
Reversed.
SEBRING, C.J., and TERRELL, THOMAS, and HOBSON, JJ., and WALKER, Associate Justice, concur.
ROBERTS, J., not participating.