79 So.2d 667 (1955)
SUNNY ISLES FISHING PIER, Inc., a Florida corporation, and Joseph C. Stehlin, Appellants,
v.
DADE COUNTY, a political subdivision of the State of Florida and I.D. MacVicar, Hugh Peters, Preston B. Bird, Jesse Yarborough, and Grant Stockdale, Members of and as constituting the Board of County Commissioners of Dade County, Florida; Haulover Park Fishing Pier, Inc., a Florida Corporation; and Leifert Construction Co., a Florida corporation, Appellees.
Supreme Court of Florida. Division B.
April 6, 1955.
Rehearing Denied May 9, 1955.
Henry M. Sinclair, Miami, for appellants.
Sibley & Davis, Miami Beach, Berger & Snetman and Hudson & Cason, Miami, for appellees.
DREW, Justice.
Between the years 1935 and 1941 the County of Dade acquired title to a large tract of land extending from Baker's Haulover for about a mile and a half north thereof and lying generally between the waters of Biscayne Bay and the Inland Waterway on the west and the Atlantic Ocean on the east. The property was gradually developed as a public park and recreation area to meet the growing needs for this type of public facility in this rapidly growing area of the State.
Realizing the need of a fishing pier extending into the ocean to be operated in connection with the principal recreation facility, and not having public funds available for such purpose, the county fathers set about to find ways and means of interesting private capital in the enterprise. In 1952, as a result of negotiations and other legal proceedings to which we shall refer hereafter, the County entered into a lease agreement with Haulover Fishing Pier, Inc., one of the appellees in this cause, whereby the County leased to such corporation for 30 years a strip of beach along the oceanfront 40 feet wide and extending from high-water mark westerly a distance of approximately 190 feet. In such lease the lessee agreed to construct a fishing pier and the necessary buildings and equipment thereon from and over said lands easterly *668 into the Atlantic Ocean in accordance with agreed plans and specifications. The pier was to be constructed in the manner and within the time set forth in the lease. The lease contained among other things a provision for posting a bond to insure the completion of the project and the payment of all costs thereof. Another provision of the lease was that the lessee would construct at its own expense a parking area of considerable size near the entrance to the pier on the County's lands which would be available at all times to the general public as well as customers of the pier. The lease contained provisions that during the term of the lease the lessee would pay all taxes and impositions against the leased premises and said pier and would keep the same adequately insured and maintain said pier in a sound condition during the term making such repairs thereto from time to time as should be required by the County. The lease contained the provisions that the leased premises should be used exclusively "for a fishing pier, the sale of bait, sandwiches, confectionery, sundries, soft drinks and beer and for the sale and rental of fishing tackle and for no other purposes unless approved in writing by the Board of County Commissioners." (Emphasis added.) The lease further provided for an annual rental of 5% of the gross receipts during the 30-year period with a guaranteed minimum rental of not less than $3,500 per year.
The lease further provided that upon its termination all improvements would become the property of the County.
Shortly after the foregoing lease was entered into, appellants, who operated a fishing pier some distance northerly of the proposed location of the pier to be constructed, instituted proceedings in the lower court to set aside the lease and to enjoin the construction of the pier. Extensive hearings were had in that court which resulted in the entry of a final decree containing the findings of the facts related above and holding that the County had the power and authority to make said lease and that "No evidence was adduced that in the making of this lease the County Commission was guilty of fraud, corruption or unfair dealing. On the other hand, the evidence establishes that the County Commission was actuated in this transaction by the highest and most praiseworthy motives in thus procuring for the people of Dade County and the visitors in this area a much needed park facility." (Emphasis added.) The decree dismissed the complaint with prejudice at the cost of the plaintiffs. This appeal was then duly prosecuted to this Court.
While the record before us is extensive, and there are 93 separate assignments of error and 8 separate questions are argued by appellants, we agree with appellees that the essence of the case revolves around the sole question of whether the County Commissioners of Dade County had the authority to provide fishing facilities for the residents and visitors in Dade County in a public park and gain revenue for the County by leasing a portion of the park to a business firm for construction and operation of a fishing pier, at no cost or expense to the County, when the portion leased is not required or being used for park purposes.
We see no necessity of going into great details or discussing at length the legislative authority which gave the County the power to enter into this lease. In addition to the general powers on the subject vested in Boards of County Commissioners, the two pertinent acts squarely on the proposition before us are Chapter 19589, Acts of 1939, Laws of Florida and Chapter 22962, Acts of 1945, Laws of Florida. Section 1 of the former act empowered the county to acquire property for recreational purposes and Section 2 vested in the Board of County Commissioners the power to develop and operate public parks and recreation centers and to charge and collect reasonable fees for the use of such facilities, privileges and conveniences as may be provided, and to "operate revenue producing facilities and accommodations in or upon properties owned or controlled by such county for the purposes aforesaid and let out the same upon such terms and conditions as are deemed to be in the public interest." (Emphasis added.) The latter act *669 provides in Section 1 that the Board of County Commissioners is "authorized and empowered to sell and convey or lease, any real and personal property that may be owned by it or by its County, providing such property in the opinion of such Board is not required for public purposes, or is not then being so used." (Emphasis supplied.) Procedures are provided in this 1945 act for selling or leasing such lands. These two acts supplement each other and may logically and sensibly be construed together. We find no inconsistency or repugnancy existing between them. And the record in this case satisfies us completely that every legal requirement essential to the validity of the lease which the County entered into was complied with.
A point urged by appellants is that the County had no authority under these acts to lease a portion of the public lands of the County to a private concern to carry on a private enterprise. We find no merit in this argument. A fishing pier is a very essential adjunct to the operation of a park of the kind which the County constructed on this mile and a half of ocean frontage. There are many benefits and advantages of such a facility in a resort area that probably attracts as many fishing enthusiasts as any other section of the world. The pier was constructed over a portion of the beach lying just north of the inlet and in an area affected by eddies and currents and undertows that render the use of the waters nearby dangerous to bathers. The record shows that such use in that vicinity had been consistently discouraged by the authorities. The amount of land actually involved is less than an ordinary city lot and is in a public park comprising more than 140 acres. The amount of oceanfront used is only a small fraction of the total oceanfront and the construction of the pier over that small portion of the beach to all practical purposes probably adds to rather than detracts from its availability to the public. It is certainly a use incidental to the main operation of this large public park. It is not only incidental to such operation but the type of operation so conducted under the lease is one clearly within the power of the County to carry on under the foregoing acts to accomplish the main purpose. We discussed a similar proposition in Gate City Garage, Inc., v. City of Jacksonville, Fla. 1953, 66 So.2d 653, 658, 659, where the question was raised concerning the propriety of a long-term lease to a private party of a filling station on and in connection with a large public parking area. Concerning this problem, we said:
"The appellants claim, however, that the reservation in the city of the authority to lease a filling station on the property is the equivalent of taking one man's property by public authority and leasing it to another for private gain and, therefore, the entire plan contravenes the constitutional provisions hereinabove set forth. There is no merit in this contention. It is elementary that the city cannot exercise the power of eminent domain for the primary purpose of acquiring private property for a private use for some other person. See State v. Town of North Miami, supra [Fla., 59 So.2d 779], and Adams v. Housing Authority of [City of] Daytona Beach, supra [Fla., 60 So.2d 663]. Constructing and leasing a filling station on a parking lot the size of that contemplated is a mere incident, the primary purpose being to acquire and construct a parking lot to serve a public and municipal purpose. In the case of Adams v. Housing Authority of [City of] Daytona Beach, supra, this Court said:
"`It should be noted that the plan does not simply provide for the sale or lease of a small portion of the property which may not be needed for housing purposes, and is, therefore, incidental, but it provides for the lease or sale of "all real property within the project area."'
"This Court takes judicial notice of the fact that in many municipal and county buildings, such as, city halls and court houses and even the State Capitol, space is leased or concessions are granted to private individuals for the *670 sale of food, magazines, newspapers, public telephones and other things which are mere incidents to the main or primary purpose of the buildings, but are for the convenience of those who use the buildings or facilities for a public purpose. In 18 Am.Jur. in the article on Eminent Domain, Sec. 41, p. 669, the author states:
"`The general rule is settled that the exercise of eminent domain for a public purpose which is primary and paramount will not be defeated by the fact that incidentally a private use or benefit will result which will not itself warrant the exercise of the power. * * *'"
A factor of importance is that for the use of this 40 feet of beach, the County is guaranteed a minimum rental of $3,500 per year and has as security for the payment of that rent a facility worth more than $150,000, which becomes the County's property at the end of the term of the lease or as provided in the lease in the event of a breach of a material condition thereof. This type of public financing should be encouraged rather than condemned. It has a tendency to preserve private enterprise of which this Court has had much to say in the cases of City of Clearwater v. Caldwell, Fla. 1954, 75 So.2d 765; State v. Town of North Miami, Fla. 1952, 59 So.2d 779; Adams v. Housing Authority of City of Daytona Beach, Fla. 1952, 60 So.2d 663. These cases last cited concerned facilities entirely different from that here under consideration and were to be financed in a manner wholly different from the method for financing of the project in the main case.
Moreover, had the county concluded to construct this fishing pier and run it as a part of the public park, open to the use of the public without charge, which it had the legal right to do, the situation then would have resulted in appellants, who are conducting a private enterprise of a similar nature a short distance north of the public pier, operating their enterprise in competition with a similar project financed out of public funds.
We find the record free of error.
Affirmed.
MATHEWS, C.J., and THOMAS and HOBSON, JJ., concur.