

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN, TEXAS 78711

CRAWFORD C. MARTIN
ATTORNEY GENERAL

April 2, 1971

Honorable Ben Barnes
Lieutenant Governor
State Capitol Building
Austin, Texas 78711

Opinion No. M-825

Re: Whether a constitutional amendment is necessary in order to empower political subdivisions to issue industrial revenue bonds.

Dear Governor Barnes:

Your request for an opinion on the above subject matter asks the following question:

"Would a constitutional amendment be required in order to empower political subdivisions to issue industrial revenue bonds such as is outlined in the attached act entitled, 'The Texas Industrial Development Act'."

"The Texas Industrial Development Act" enclosed with your request authorizes cities, counties and navigation districts to issue revenue bonds for the purpose of acquiring property for industrial development purposes and to lease such property, "upon such terms and conditions as the governing body may deem advisable and as shall not conflict with the provisions of this Act."

Subdivision a of Section 5 provides:

"All bonds issued by a city or county or navigation district under the authority of this Act shall be limited obligations of the city or county or navigation district. Bonds and interest coupons issued under the authority of this Act, shall not constitute or give rise to a pecuniary liability of the city or county or navigation district or a charge against its general credit, (emphasis ours), or taxing powers. Such limitation shall be plainly stated upon the face of each of such bonds."

Section 52 of Article III of the Constitution of Texas prohibits the lending of its credit by any political subdivisions, and makes no distinction between the general or special credit

of such subdivisions. Section 52 of Article III provides:

> "The Legislature shall have no power to
> authorize any county, city, town or other polit-
> ical corporation or subdivision of the State to
> lend its credit or to grant public money or thing
> of value in aid of, or to any individual, association
> or company;...."

The questions raised as to the legality of "The Texas Indus-
trial Development Act" are:

> (1) Whether the issuance of industrial revenue
> bonds would violate the State Constitution's credit
> clause; and,

> (2) Whether the issuance of such bonds to finance
> the building of factory and similar industrial facilities
> would serve a valid public purpose.

A number of Texas cases and Attorney General Opinions in-
dicate that if the "Public Purpose Doctrine" is satisfied, the
"Credit Clause" is rendered inapplicable by virtue of any private
benefit having become subordinate to the general public necessity.
These cases and opinions have for the most part been interpretive
of Article III, Section 51 of the Constitution dealing with
grants of public monies rather than lending the public credit,
but we believe the principles involved apply equally to both
concepts. State v. City of Austin, 160 Tex. 348, 331 S.W.2d
737 (1960); Brown v. Galveston, 97 Tex. 1, 75 S.W. 488 (1903);
52 Tex. Jur. 2d 754-757, State of Texas 843; Attorney General's
Opinions Nos. V-1067 (1950) and C-530 (1965).

Our consideration of this problem is, by virtue of the
preceding authorities, narrowed to a consideration of whether
or not the issuance of industrial revenue bonds is for a valid
public purpose.

In Bland v. City of Taylor, 37 S.W.2d 291 (Tex. Civ. App.
1931, aff. 123 Tex. 39, 67 S.W.2d 1033) the Court of Civil Appeals
observed:

> "What constitutes a public purpose as contra-
> distinguished from a private purpose for which
> public funds may be applied has been repeatedly
> before the courts of practically every State in

the Union and the Supreme Court of the United States, but no court has undertaken to lay down with minute detail an inexorable rule that would distinguish one from the other. Obviously no such rule could be laid down...." (37 S.W. 2d 291, at p. 293).

We regard the question as extremely difficult, especially in view of the fact that our search has uncovered no Texas case or authority involving the constitutionality (public purpose) of the issuance of industrial revenue bonds. In rendering this opinion, then, ordinarily our function would be to anticipate, as best we can, the holding of the courts if and when the question should be presented to them, but where our opinion affects the validity of bonds, additional problems are involved. The Attorney General approves the issuance of practically all types of public securities issued in Texas as to their legality, based upon his examination of the underlying legal proceedings authorizing the actual issue. In this instance we are asked to give our opinion as to the legality of bonds in advance of the receipt of any actual proceedings authorizing them, and in a situation where the constitutionality of their statutory authorization has been questioned.

Outside this jurisdiction there are two diametrically opposed views as to the constitutionality of industrial aid bonds authorized solely by statute.

These views are best illustrated by a short historical resume of decisions on this question. We quote several excerpts from the Vanderbilt Law Review, Vol. 19 (1965), the first at pages 31-32, as follows:

"The United /States/ Supreme Court's decision in Citizens' Savings & Loan Ass'n. v. Topeka,[21] is probably the forebear of all judicial precedents considering the use of municipal bonds to aid local industry, and for many years it was the principal authority on the constitutional question involved. Pursuant to an enabling act of the Kansas legislature, Topeka had donated 100 thousand dollars of its bonds to an iron works company in order to encourage its establishment in the city. In an action brought after the bonds had defaulted, it was conceded that they had been regularly issued and that the plaintiff

---

[21] 87 U.S. 655 (1875).

was a bona fide purchaser so that the sole
question was the authority of the Kansas
legislature to pass the enabling statute....
It was held that a tax can only be levied for
a public purpose and that a contribution to
the aid of any manufacturer was not such a
purpose. Hence, these bonds were void."
(emphasis ours).

Similar results followed in Parkersburg v. Brown, 106 U.S.
487 (1883), and Cole v. La Grange, 113 U.S. 1 (1885).

At page 33 this law review makes this comment on these
cases:

"Unfortunately for the innocent holders involved
in the Topeka, Parkersburg and La Grange cases, these
decisions were not rendered prior to the sale of bonds
but several years later when suit was brought for their
payment. The recent decisions on this subject have all
been the result of some type of test case...."

After the U. S. Supreme Court's decisions in these three
early cases, the Court began in Jones v. Portland, 245 U.S. 217
(1917), an about-face. We quote again from the Vanderbilt Law
Review, supra, Volume 19, at page 34:

"In Jones v. Portland,[30] the Court considered
an act of the Maine legislature authorizing any
city to establish a municipal coal and fuel yard
where such necessities could be sold at cost. . . .
This endeavor was approved and the Court added:

'While the ultimate authority to determine
the validity of legislation under the Fourteenth
Amendment is rested in this Court, local conditions
are of such varying character that what is or is
not a public use in a particular State is manifestly
a matter respecting which local authority, legisla-
tive and judicial, has peculiar facilities for
securing accurate information. In that view the
judgment of the highest court of the State upon
what should be deemed a public use in a particular

---

[30]245 U.S. 217 (1917).

State is entitled to the highest respect.'"[31]

At page 37 this law review article states:

"The various state courts considering the validity
of industrial development bonds have had much more
difficulty resolving the problems presented under the
state constitutions than in satisfying the requirements
of the fourteenth amendment. In addition to the uni-
versally implied requirement that the taxing and
borrowing powers of a state are subject to the public
purpose doctrine, almost every state constitution
specifically prohibits the use of the credit of the
state or any of its political subdivisions for the
aid of any private party.[44]"

Nevertheless, the majority of state courts which have faced
and dealt with the problem have upheld the bonds on the theory
that the relief of unemployment caused by underdevelopment of
industry, and the resultant poverty and human hardship are indeed
public purposes for which the states can use private industry
for the accomplishment of such public purpose.

Again we quote from the Vanderbilt Law Review, supra, at
pages 38-39:

"The first contrary decision was reached in Florida
where the court not only found that a proposed revenue
bond arrangement violated the specific constitutional
prohibition against the lending of credit but added
that any financing of private enterprise by the use
of public funds was entirely foreign to our constitu-
tional system no matter how worthwhile the undertaking.[49]
As opposed to the decisions in Kentucky and Alabama,
this court did not place any significance on the fact
that revenue bonds would not involve any municipal
liability or tax. On the contrary, it states that,
once the bonds were sold, the proceeds would be public
funds and could not be expended in aid of any private

---

[31]Id. at 221.

[44]Note, 108 V.Pa.L.Rev. 95 (1959).

[49]State v. Town of North Miami, 59 So.2d 779 (Fla. 1952).

enterprise.[50]   There had been no enabling legislation
nor any vote of the electorate on the Florida
proposal.  However, the court took pains to avoid
any implication that a specific legislative deter-
mination of public purpose would have changed
its decision, stating that:  'There are certain
limits beyond which the Legislature cannot go.
It cannot authorize a municipality to spend public
money or lend or donate, directly or indirectly,
public property for a purpose which is not public.
A legislative determination may be persuasive,
but it is not conclusive.'[51]

"The Florida decision was followed in Nebraska[52]
and Idaho.[53]  The Nebraska court felt that the deci-
sions in three of its sister states approving revenue
bonds were based on 'fundamental fallacies of reason-
ing,' and that the proposed arrangement 'would con-
stitute a death blow to the private enterprise system
and reduce the Constitution to a shambles in so far
as its protection of private enterprise is concerned'.
. . .[54]

"On the other hand, the Supreme Court of Maryland,
in approving an issue of general obligation bonds,
stated that the Constitution does not write the doctrine
of laissez faire into the law and expressly rejected

---

[50]This reasoning was followed in Ohio where the court
invalidated an industrial mortgage program financed by state
revenue bonds.

[51]State v. Town of North Miami, supra note 49, at 785.

[52]State ex re. Beck v. City of York, 164 Neb. 223, 82
N.W.2d 269 (1957).

[53]Village of Moyie Springs v. Aurora Mfg. Co., 82 Idaho
337, 353 P.2d 767 (1960).

[54]State ex rel. Beck v. City of York, supra note 52, at
231, 82 N.W. 2d at 274.

the reasoning of the Florida and Nebraska cases.[55]
The Nebraska decision was overridden by a specific
constitutional amendment.  Similar amendments have
been adopted in four other states, and the bonds
upheld without amendment in at least twelve states.[56]"

At page 42 of this Vanderbilt Law Review, supra, Volume 19,
is the following:

"... The constitutional arguments in the
state courts have almost all followed the same pattern,
and the difference between those decisions upholding
the acts and those declaring them invalid appears to
be a matter of emphasis.  The question has been whether
the public benefit is an incident of the aid to private
enterprise, or whether the use of private enterprise
is merely an aid to a municipality in accomplishing
the real purpose of the bonds.  This difference is
one of degree and more of an economic debate that
has been, and presumably will continue to be, a
matter of some controversy.  Although the greater
number of courts have upheld the bond issues, there
is a clear conflict in the state decisions and no
statute could be safely implemented without the
approval of the highest court of the particular State."
(emphasis ours)

In view of the language in Bland v. City of Taylor, supra,
wherein the court indicates that public purpose is a question
which can only be determined by consideration of the facts in
any particular situation, any attempt by the Attorney General
to speculate what our Supreme Court might hold in a case in-
volving this question of constitutionality, in view of a split
of authorities in other states, particularly where bonds were
outstanding, would involve a risk so great to the credit of
this State and its political subdivisions, that the Attorney

---

[55]City of Frostburg v. Jenkins, 215 Md. 9, 136 A.2d 852
(1957).  This case contains an excellent summary of the several
constitutional problems involved.

[56]The amendments and decisions are set out in the appendix.

General in all candor, cannot undertake it. This has long been the Attorney General's policy. See Attorney General Opinion No. O-3106 (1941).

In states where this risk has been taken and outstanding public obligations have been declared void, the credit and financing ability of the state and all its subdivisions have been interrupted for years. Traditionally, the municipal bond market will not touch, under any circumstance, securities which are tainted by even the slightest hint or suggestion of unconstitutionality.

## S U M M A R Y

Absent a definitive decision by the Supreme Court of Texas, and in the light of a split of authorities on the question in other states, this office will not speculate and advise how the Texas Supreme Court would rule on the constitutionality of the proposed statute (The Texas Industrial Development Act) to empower political subdivisions to issue industrial revenue bonds, based upon a legislative declaration of public purpose.

Very truly yours,

CRAWFORD C. MARTIN
Attorney General of Texas

By _____
NOLA WHITE
First Assistant

Prepared by Joseph H. Sharpley
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

Kerns Taylor, Chairman
W. E. Allen, Co-Chairman

Houghton Brownlee
John Banks
John Grace
J. C. Davis

MEADE F. GRIFFIN
Staff Legal Assistant

ALFRED WALKER
Executive Assistant

Honorable Ben Barnes, page 9        (M-825)