ANDREW ALBRIGHT, PLAINTIFF IN ERROR, v. SUSSEX
COUNTY LAKE AND PARK COMMISSION, DEFENDANT
IN ERROR.

Argued November 20, 1903—Decided February 29, 1904.

The right to fish in an inland lake of New Jersey cannot be sepa-
rated from the ownership of the lake and taken under the power
of-.eminent domain, because—*first*, the natural supply of fish
therein is so small as to be incapable of meeting a public de-
mand, and *second*, the object of acquiring such a right is not *use*,
which implies utility, but mere sport or pastime. *Quære.* Is
the value of such a right capable of estimation, so that a com-
pensation may be awarded therefor which shall be just with
respect both to the private owner and to the public purchaser?

On error to the Supreme Court. The opinion of that court
is reported in 39 *Vroom* 523.

For the plaintiff in error, *Charles D. Thompson* and
*Charles L. Corbin.*

For the defendant in error, *Griggs & Harding.*

The opinion of the court was delivered by

DIXON, J. "An act to acquire rights of fishing common to
all in fresh-water lakes in certain counties, to acquire lands
adjoining thereto for public use and enjoyment therewith,
and to regulate the same" (*Pamph. L.* 1901, *p.* 333), declares
that in any county of the state wherein are fresh-water lakes,
having an area of water surface exceeding one hundred acres,
a commission may be appointed which shall have power to
take, in fee or otherwise, by purchase, gift, devise, or eminent
domain, and to maintain and make available to the public *the
right of fishing* in such lakes. Under this statute a com-
mission has been appointed in Sussex county and is attempting
to take, by eminent domain, the right of fishing in Swarts-
wood lake, which belongs to the plaintiff in error. The

plaintiff resists this attempt upon the ground mainly that the power of eminent domain cannot constitutionally be exercised for the stated purpose.

In olden times the eminent domain seems to have been employed only in cases of state necessity, and there is no instance of its exercise in New Jersey prior to 1776, except for highways. But, undoubtedly, its scope has been much enlarged in recent times to keep pace with the advance in social conditions. *Scudder* v. *Trenton Delaware Falls Co., Sax.* 694. Still, even as late as 1852, Chief Justice Green spoke of the objects for which the state exercises this power as being few in number. 3 *Zab.* 357.

Under our state constitution (article 1, paragraph 16) private property can be taken only for public use. Whether the end sought to be attained by the taking is a public use is a question to be determined by the courts, although it is said there is a presumption in favor of a use declared by the legislature to be public. *Mills Em. Dom.,* § 10; *Lewis Em. Dom.,* § 158; *Scudder* v. *Trenton Delaware Falls Co., Sax.* 694, 727; *Olmsted* v. *Morris Aqueduct,* 18 *Vroom* 311; *National Docks Railroad Co.* v. *Central Railroad Co.,* 5 *Stew. Eq.* 755, 764. The language of the constitution does not authorize property to be taken "for public enjoyment" or "for public purposes," or, generally, "for the public." Its expression is "for public use," which implies an idea of utility, of usefulness, not necessarily inherent in the other phrases mentioned.

The duty is therefore devolved upon this court to determine whether the object to be subserved by the condemnation of the right to fish in the plaintiff's lake is a *public use.*

In order that a use may be public, it is not essential that the whole community should be able directly to participate in it. Thus, a free school for children is for a public use, although only a fraction of the community can attend it. But it is essential that the utility should in a substantial measure concern the public, as, for example, the education of the young concerns the community.

The right to be condemned under this statute is merely the right to fish. Such a right is, in the ancient legal French, called a right *profit á prendre,* a right so peculiarly for personal enjoyment that it is incapable of being acquired by the general public, either by custom (*Cobb* v. *Davenport, 3 Vroom* 369) or by dedication. *S. C., 4 Id.* 223; *Albright.* v. *Cortright,* 35 *Id.* 330. No doubt there is a public right of fishing recognized by municipal law; it exists in the waters of the ocean along the coast and in the arms of the sea, as far as the tide ebbs and flows. But this right differs from that now under consideration in several important respects. In the first place, it is a mere incident of the public ownership of the public waters, while the object of the present proceedings is to sever the right of fishing from the title to the lake and give it an independent existence. If the legislature had provided for the condemnation of the lake, so as to confer upon the public the right of resorting thereto for all purposes to which it is adapted, the condemnation might then have been supported on the precedents which find a public use in parks, and the right to fish would have passed as an incident of the public title. But under this statute the ownership of the lake is to remain private. In the next place, the natural supply of fish in the public waters is practically inexhaustible, if the right to fish therein be subjected to such regulations as will reasonably guard it for the free enjoyment of the general public. But the natural supply of fish in the inland lakes of New Jersey is so small that if the right to catch fish therein were exercised by persons sufficiently numerous to be deemed the public, the supply would soon come to an end. Lastly, fishing in the public waters has from time immemorial constituted an industry fostered by law for the supply of the general market, while fishing in these private waters has been and can be only for individual amusement and gain. We think, therefore, that for present purposes there is no substantial resemblance between the common right to fish in public waters and the right now in question.

I turn, then, to the consideration of the matter in view of the rules which have been laid down as aids in determining what is a public use within the meaning of this provision of the constitution. A definition of the phrase has not, I think, been judicially attempted, but among the statements of the doctrine to be found in the books that of Professor Cooley seems most likely to subserve the general welfare for which the constitutional power is delegated, and at the same time to protect private property, which is equally a ward of our constitution. He says (*Const. Lim.* 553) : "The reason of the case and the settled practice of free governments must be our guides in determining what is, or is not, to be regarded as a public use, and that only can be considered such where the government is supplying its own needs, or is furnishing facilities for its citizens in regard to those matters of public necessity, convenience or welfare which, on account of their peculiar character, and the difficulty of making provision for them otherwise, it is alike proper, useful and needful for the government to provide."

Applying this as the test, the present statute cannot be supported.

The right to be enjoyed under this statute is necessarily the right of each individual who exercises it to abstract from what is designed by the statute to be a common stock such portion as he can secure, and to appropriate that to his own benefit. This is for private, rather than public, advantage. The statute does, indeed, contemplate the acquisition of the common stock by public agents, but they are to acquire it for private benefit. If the common stock thus to be acquired were capable of supplying an unlimited number of persons, then they might be deemed, in a constitutional sense, the public; but, as already stated, the stock would be quite inadequate for such a demand. The fact that a small supply is tendered free to the first takers does not show that the public can enjoy it.

But not only does the constitution require that the property taken should be for the public; it is also necessary that

it should be for *use*. The chief purpose in the enjoyment of the property must be utility. But it cannot be doubted that the main object of the present statute is to furnish a means of amusement or sport to the few persons who have the inclination and leisure for such pastime. The public utility to be subserved by such indulgence is imperceptible. "The reason of the case," therefore, does not seem to warrant the conclusion that the proposed taking is "for public use."

When we look to "the settled practice of free governments," we find no parallel for the present enterprise. There are many instances of the exercise of eminent domain for the purpose of furnishing facilities to be enjoyed by individuals. Such are parks, highways, ferries, railways, telegraph and telephone lines, &c. But these differ from the right now under consideration in important respects—*first,* they are essentially useful; *secondly,* they are used by great numbers of people, and *thirdly,* their use by the individual abstracts nothing appreciable from the common opportunity of use.

There are also some instances of the exercise of the power in order to afford facilities for private enjoyment where it is intended that each individual shall abstract a portion from the common stock. An example appears in the condemnation of water for domestic purposes in populous neighborhoods. But here, also, marked differences from the present scheme are observable. The end sought is utility of the greatest urgency, and the natural supply is so abundant that private abstraction cannot exhaust it. In all such instances these characteristics will be found in substantial measure to make them of use to the public. We have found no instance of the exercise of the power in order to afford a means of pastime capable of being enjoyed by only a few persons.

There is another consideration deserving of some weight. The constitution requires that on taking private property for public use just compensation should be made to the owner, and this implies that the property taken shall be reasonably capable of just estimation. The lake itself could, no doubt, be fairly appraised, as could, probably, the right of any

individual or of any specified number of individuals to fish therein. But I know of no criterion by which the right of an unlimited number of persons to spend their time upon the lake for the purpose of catching fish could be valued. It might be that the appraisers would evade the difficulty by awarding to the owner the full value of the lake, but in that case justice would require that the lake itself, and not a mere incidental right in it, should become public property.

We think, therefore, that neither in the reason of the case nor in the settled practice of free governments is there legal support for the proposed condemnation.

The power of eminent domain is one of the extreme powers of government. When employed for the purpose of enabling it to perform its own functions its scope is limited only by the wisdom of the legislature. But when it is exerted with the view of furnishing facilities to private individuals, it so easily runs into the taking of one man's property to give it to others, in disregard of that right which the constitution declares to be inalienable—the right of protecting property— that it behooves the courts, where private owners can be fully heard in their own behalf, to take care that constitutional rights are guarded and constitutional limitations observed.

On full consideration, we are constrained to adjudge that the present proceedings are designed to take the plaintiff's property for other than the public use, and are therefore illegal.

The judgment of the Supreme Court should be reversed and a judgment entered setting aside the proceedings taken under the statute.

*For affirmance*—The Chief Justice, Vroom. 2.

*For reversal*—The Chancellor, Dixon, Garrison, Swayze, Bogert, Vredenburgh, Green, Gray. 8.