60 So.2d 663 (1952)
ADAMS
v.
HOUSING AUTHORITY OF CITY OF DAYTONA BEACH et al.
Supreme Court of Florida, en Banc.
August 12, 1952.
Rehearing Denied October 21, 1952.
*664 Maurice F. Foster, De Land, for appellant.
W. Cecil Grant, John L. Graham and Hull, Landis, Graham & French, Daytona Beach, for Housing Authority of the City of Daytona Beach.
Wm. W. Judge, Daytona Beach, for City of Daytona Beach.
MATHEWS, Justice.
Acting under the authority of Chapter 23077, Acts of 1945, now Section 421.08 note, F.S.A. and amendments thereto, the appellees authorized and undertook a redevelopment project for the purpose of clearing a blighted area by acquiring by purchase or eminent domain real estate of the blighted area and to make it available for sale or lease to private enterprises. Appellant, the owner of some of the land in the blighted area and an affected taxpayer of the City of Daytona Beach, instituted this suit by bill in equity to restrain or enjoin the appellees from acquiring the land in question by eminent domain or purchase and to adjudicate the constitutionality of Chapter 23077, Acts of 1945, and the amendments thereto. At final hearing before *665 the Chancellor, at which testimony was taken by the Chancellor, he denied application for injunctive relief and upheld the validity of the Statutes in question. This appeal is from that final decree. Mr. J.N. Miller, the Executive Director of the Housing Authority, testified at the hearing before the Chancellor as follows:
"Q. Mr. Miller, is it not the plan of the Housing Authority after these proposed new structures are built upon the area that the same shall be disposed of to private owners? A. That is true. I would like to make an explanation there. We dispose of the land only; private enterprise must do the development."
It is urged that Chapter 23077, Acts of 1945 and the amendments thereto, violate Sections 1 and 12 of the Declaration of Rights and Section 29 of Article XVI of the Constitution of Florida, F.S.A., and the 14th Amendment to the Constitution of the United States because they attempt to authorize the taking of private real property by eminent domain, or purchase, all of which may be sold or leased for private commercial and industrial purposes. It is further urged that the Act violates Section 1 of the Declaration of Rights and Sections 5, 7 and 10 of Article IX of the Constitution of Florida because of the attempt to expend public funds and tax revenues of the City of Daytona Beach and to provide a cash grant which will total one-third of the cost of the development when all of the land is to be leased or sold for private use by corporations, associations, institutions or individuals.
Prior to 1945, this Court had upheld the validity of Section 421.02, et seq., F.S.A., which was Chapter 17981, Acts of 1937. The Act of 1937 was entitled:
"An Act to Declare the Necessity of Creating Public Bodies Corporate and Politic to be Known as Housing Authorities to Undertake Slum Clearance and Projects to Provide Dwelling Accommodations for Persons of Low Income * * *."
It is quite evident that the purpose of Chapter 23077, Acts of 1945, was to extend the power of Housing Authorities so as to authorize them to acquire by voluntary purchase or by eminent domain real property in blighted areas for development purposes and make it available to private enterprise for commercial and industrial uses.
The City Council of Daytona Beach and the Housing Authority had taken the steps provided for by Chapter 23077, Acts of 1945, for the redevelopment of a blighted area.
The questions presented by this appeal are of first impression in this Court. The cases of Marvin v. Housing Authority, 133 Fla. 590, 183 So. 145; Lott v. City of Orlando, 142 Fla. 338, 196 So. 313; Higbee v. Housing Authority of Jacksonville, 143 Fla. 560, 197 So. 479; and State ex rel. Grubstein v. Campbell, 146 Fla. 532, 1 So.2d 483, were with reference to slum clearance and where the real estate was to be acquired and the slums demolished for the purpose of erecting low cost houses on the acquired land in order to take care of the people displaced by reason of the slum clearance and others in the low income tax brackets. Every case so far adjudicated by this Court has had these elements present. Up to the present time there has been no case presented where a Housing Authority attempted to acquire by purchase or condemnation lands which constituted a slum area in order to devote such lands to private commercial and industrial enterprises. Each of the above cases was decided before the enactment of Chapter 23077, Acts of 1945. The last mentioned case of State ex rel. Grubstein v. Campbell, supra, was decided in April, 1941.
We are not unmindful of the fact that laws similar to Chapter 23077, Acts of 1945, have been upheld by some of the Courts of last resort of other states in the Union. We have our own Constitution and adjudicated cases by this Court which are controlling in this case.
The proceedings in this case have been taken under Chapter 23077, Acts of 1945, as amended. The amendments are not material to the discussion here because they simply fix the application of the Act to municipalities of certain population.
*666 The very title of the Act in question shows that its main purpose appears to be:
"* * * to Acquire by Purchase or Eminent Domain Real Property in Blighted Areas and Make It Available under Certain Conditions for Redevelopment by Private Enterprise or by Public Agencies in Accordance with Approved Redevelopment Plans". (Italics supplied.)
At the outset we should bear in mind that there is a clear distinction between the power of eminent domain and the police power. The power of eminent domain is that sovereign power to take property for a public use or purpose and this cannot even be done without just compensation. On the other hand, the police power is that power by which the Government may destroy or regulate the use of property in order to "promote the health, morals and safety of the community", and the police power may be exercised without making compensation for the impairment of the use of property or any decrease in the value of property by reason of the regulated use. See Blitch v. City of Ocala, 142 Fla. 612, 195 So. 406; City of Miami Beach v. Ocean & Inland Co., 147 Fla. 480, 3 So.2d 364; Pasternack v. Bennett, 138 Fla. 663, 190 So. 56; Lott v. City of Orlando, 142 Fla. 338, 196 So. 313; 29 C.J.S., Eminent Domain, § 6, p. 784; and 18 Am.Jur., Eminent Domain, p. 639, Sec. 11.
The appellees urge that it is admitted that the area in question is a blighted area and unless they can acquire title to and ownership of this land and carry out their redevelopment plan, they have no means or method of coping with the situation and clearing up this blighted area. There is no merit in this contention. If the only purpose is to remove or abate a blighted area, the police power is ample.
Our general laws relating to cities and towns, Chapter 176, F.S.A., with reference to zoning and Section 167.05, F.S.A., with reference to abatement of nuisances and the preservation of the public health confer sufficient power. These provisions of our Statutes have been liberally construed by this Court.
In the case of Standard Oil Company v. City of Tallahassee, 87 F. Supp. 145, in an opinion by Judge Dozier Devane, United States District Judge, it was held that an ordinance requiring discontinuance of the gasoline service station in the City of Tallahassee near the State Capitol, the State Supreme Court Building, and several other state office buildings, and a public school, was justified as a reasonable exercise of the police power, later affirmed by the Circuit Court of Appeals of the Fifth Circuit in Standard Oil Co. v. City of Tallahassee, 183 F.2d 410.
If, after notice, the City has the authority to order the discontinuance of a filling station, it would likewise have the power to order the discontinuance of the occupation of houses which are unsafe, unsanitary or breeding grounds for disease, or if it desired, it could condemn the houses by the process of eminent domain and leave the real estate for the owners to redevelop or use within the limits of a zoning ordinance. See City of Miami Beach v. Ocean & Inland Co., supra; City of Miami Beach v. Texas Co., 141 Fla. 616, 194 So. 368, 128 A.L.R. 350; Rowland v. State, 129 Fla. 662, 176 So. 545, 114 A.L.R. 443; City of Miami v. Direct Distributors, 134 Fla. 430, 183 So. 841; and Citizens Insurance Co. v. Barnes, 98 Fla. 933, 124 So. 722.
The question in this case is not simply the abatement or discontinuance of a nuisance or a blighted area. This is not simply a case of slum clearance in order to promote the public health, safety, morals and general welfare of the inhabitants and citizens of Daytona Beach. On its face it is a "redevelopment" plan and a mere inspection of the plan shows it to be a real estate promotion. The very words of the plan declare it to be for the purpose of acquiring title to and ownership of several blocks of property constituting six and one-half acres now used for residences to be redeveloped and sold or leased to private individuals, associations or corporations for private commercial and industrial purposes. *667 As will be shown hereafter, it is not the purpose of the plan to acquire this land to erect new residences to be rented to persons in the low income brackets.
In the plan, which was approved by the City authorities, it is shown that the area now has 70 residential structures containing 75 dwelling units and 5 non-residential structures. The plan states "the majority of the structures are in such a dilapidated condition that they are dangerous to the occupants and not worth the consideration of being rehabilitated".
In order to remove these structures it is not proposed that the police power be exercised to accomplish this purpose. It is proposed that the power of eminent domain or the power to purchase be used to acquire the fee simple title to the land on which the buildings are situated.
The plan shows that the area is now zoned for business use under classifications of "AA-10", "AA-15" and "B" Districts. The plan then declares:
"The Redevelopment Plan, however, will not permit residential use in the project area."
The plan further declares:
"The real property within the project area will be acquired * * * by purchase through negotiation or by the exercise of the power of eminent domain * * *"
In order to show that the purpose of the plan is not to build low cost houses for low income bracket families, the plan solemnly declares:
"All occupants in the project area are Negroes. There are approximately sixty families now living in the area to be acquired and cleared by the Housing Authority. Fifty-two of these families are eligible for low-rent housing. The housing project now under construction on South Street, consisting of 100 dwelling units, will be available for all families in the lower income bracket who want to apply." (Italics supplied.)
In other words, the Housing Authority declares as a part of the plan that it now has under construction, and unconnected with the acquisition of the fee simple title to this real estate, a housing project consisting of 100 dwelling units which will be available for all families in the low income bracket who want to apply. This eliminates one of the essential provisions of every plan approved by this Court of any Housing Authority in the State to the present time.
It should be noted that the plan does not simply provide for the sale or lease of a small portion of the property which may not be needed for housing purposes, and is, therefore, incidental, but it provides for the lease or sale of "all real property within the project area". The purpose and intent is fully set forth as follows:
"After the site of the project area has been cleared and prepared in accordance with the plan of the site, the Housing Authority of the City of Daytona Beach, Florida, will sell all real property within the project area on the basis of the fair value of such property for uses in accordance with the Redevelopment Plan. This fair value will be determined with the assistance of appraisals made independently by two qualified local appraisers.
"The sale of the property within the project area will be conditioned on the development and use of the property in conformance to the Redevelopment Plan. The Housing Authority will require each purchaser to submit, for approval, plans and other information in sufficient detail as to assure the proper development of the area."
The Housing Authority, in order to show conclusively that it is a real estate promotion for private commercial and industrial purposes, states that it will be "offered for sale through extensive advertising". As a further evidence of the intent and purpose of the promoters, the plan contains the following:
"The Redevelopment Plan proposes retail commercial, warehousing and light industrial use within the project area. The proposed uses conform to the General Plan of Daytona Beach, Florida.
*668 "1. New Uses
"That portion of the project site abutting Second Avenue will be for retail commercial use and that portion abutting Cypress Street will be for retail commercial use in conjunction with the warehousing and light industrial uses in that portion of the project site between Weaver Street and the Florida East Coast Railway Right-of-way. Within the boundaries of the project area an industrial rail siding will be installed by the Florida East Coast Railway parallel to the railway right-of-way."
As a further inducement to private enterprise to buy this property for commercial and industrial purposes, the Housing Authority proposed to build new streets, put in sidewalks, new sewers and then the plan proposes:
"At the time of paving Weaver Street, it is proposed, as a site improvement, to pave the loading zone on that portion of the land to be made available for warehousing and light industrial use."
The plan proposed by the Authority even goes into detail about proposed contracts for the installation of industrial rail siding as follows:
"The Florida East Coast Railway proposes to enter into a contract with the Housing Authority or the purchaser for the installation of an industrial rail siding to serve the land within the project area to be made available for warehousing and light industrial uses."
As to future controls the plan adopted and proposed by the Authority provides:
"No residential structures or residential use within the structures will be permitted within the project area. The uses to be permitted within that portion of the project area described as retail commercial are as follows:
"a. Retail uses designed primarily to serve the immediate neighborhood and the general community and the industrial establishments within the project area.
"b. Office, display, and allied uses in connection with warehousing and light industrial establishments.
"c. Parking areas for the use of customers and employees of commercial and industrial establishments.
"The following uses will be permitted within that portion of the project fronting on both Cypress and Weaver Streets:
"a. Wholesale and restricted industry, included but not limited to warehousing; wholesale merchandise; storage; furniture, cabinet, plumbing or sheet metal shops; bottling works; cold storage, laundry or dry cleaning establishments; and building supplies. In the case of industrial establishments the use shall be subject to the approval of The Housing Authority of the City of Daytona Beach and the City Planning Board.
"The type, size, height, number and proposed use of the buildings shall conform to the zoning ordinance, the building and other codes, as they exist or as they may be amended by the City Commissioners on the date of approval."
There are attached to and made a part of the development plan large maps and plats showing in detail the proposed improvements.
The whole development plan as set forth in this record, together with the plats and maps attached, is the usual prospectus put forth by a real estate developer of a new subdivision, for private enterprise and for industrial and commercial purposes to be conducted by private individuals, associations or corporations for private gain and profit.
It is inconceivable that any one would seriously contend that the acquisition of real estate for the declared purposes set forth in the proposed Redevelopment Plan is for a public use or purpose. No one has ever heard of any corporation, association or individual going into any of the above mentioned businesses except for profit or gain. If the municipalities can be vested with any such power or authority, they can *669 take over the entire field of private enterprise without limit so long as they can find a blighted area containing sufficient real estate.
In determining the questions involved in this case there are certain fundamental principles which are controlling.
The question of whether constitutional provisions against the taking of private property for private use have been violated is, like all constitutional questions, ultimately for the Courts. The question of public use is a judicial question. Spafford v. Brevard County, 92 Fla. 617, 110 So. 451; Wilton v. St. Johns County, 98 Fla. 26, 123 So. 527, 65 A.L.R. 488; Sibley v. Volusia County, 147 Fla. 256, 2 So.2d 578; 18 Am.Jur., p. 675, Sec. 46; Brumby v. City of Clearwater, 108 Fla. 633, 149 So. 203.
Incidental benefits accruing to the public from the establishment of some private enterprise is not sufficient to make the establishment of such enterprise a public purpose. In the Article on Eminent Domain, 18 Am.Jur., Sec. 45, p. 675, the author states:
"It may be taken as established law that the incidental benefit accruing to the public from the establishment of a large factory, mill, department store, or other industrial or commercial enterprise is not a valid ground for ranking such an enterprise as a public use and intrusting it with the power of acquiring a suitable site by eminent domain. Private enterprises that give employment to many and produce various kinds of commodities for the use of the people are not necessarily public uses. Every legitimate business, to a greater or less extent, indirectly benefits the public by benefiting the people who constitute the state, but that fact does not make such enterprises public businesses. * * *"
When the taking of private property is for a public use or purpose, the Courts will not review the determination of the necessity for such taking in the absence of fraud, bad faith, or gross abuse of discretion. Wilton v. St. Johns County, supra; Sibley v. Volusia County, supra.
The appellant relies upon the case of Peavy-Wilson Lumber Co. v. Brevard County, 159 Fla. 311, 31 So.2d 483, 485, 172 A.L.R. 168. The appellees claim it has no application in this case. It is true that the question of a blighted area was not involved in that case. However, the County did attempt to acquire by eminent domain a large tract of land which contained good hunting and fishing territory under the theory that it might in the future establish some public parks and playgrounds, which would serve a public purpose. In that case the Court said:
"As our concepts of a democracy have grown, greater emphasis has been placed on the rights of the citizen among which has been the privilege to `have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring possessing and protecting property, and pursueing happiness and obtaining safety.' Section 1, Declaration of Rights, Florida Constitution. * * *
"To take one man's property, against his will  at public expense, and make it available to a group who may have the leisure and inclination to hunt and fish constitutes a private rather than a public use. See Albright v. Sussex County Lake & Park Commission, 71 N.J.L. 303, 57 A. 398, 69 L.R.A. 768, 108 Am.St.Rep. 749, 2 Ann. Cas. 48; Nichols on Eminent Domain (2nd ed.) Vol. 1, page 518, Sec. 165. * * *
"Public benefit follows naturally when any worthy enterprise is established, resulting in employment and greater taxes for the government; but public necessity does not require that the several counties should condemn private property and engage in competition with the citizens who make a living by providing hunting and fishing lodges and other forms of amusement. * * *"
The real difference in the case at bar and that of Peavy-Wilson Lumber Co. v. *670 Brevard County, supra, is that in the case now under consideration real estate is to be acquired at public expense to make it available to a group of people, associations, or corporations who may wish to go into the named commercial enterprises or industries instead of taking the property at public expense for the purpose of establishing hunting and fishing grounds.
In the recent case of State of Florida v. Town of North Miami, Fla., 59 So.2d 779, 787, the Town proposed to buy one particular piece of property, build an industrial plant on it and lease it to a manufacturing concern engaged in private business for private gain. In a unanimous opinion, we said:
"This is simply a case where the municipality is attempting to use the power of the municipality to purchase land and erect industrial or manufacturing plants thereon for the use of a private corporation for private profit and private gain. Should the certificates be sold, the money derived therefrom would belong to the Town and would be public funds.
"We hold that the proposed certificates of indebtedness and the lease are void because: first, the proposal to attempt to use the power of the municipality and the proceeds from the certificates of indebtedness to purchase land and erect an industrial or manufacturing plant thereon for the use of a private corporation for private profit and gain does not serve a public or municipal purpose, and, second, Section 10 Article IX of the Constitution provides: `The Legislature shall not authorize any * * * city * * * to obtain or appropriate money for, or to loan its credit to, any corporation * * *.' Manifestly, the project in question could not have been legally authorized by the Legislature, and certainly the power of the Town of North Miami, in the matter, could not be extended to the exercise of a power which the Legislature could not validly confer. Hence, the project contemplated is in plain violation of the spirit and letter of Section 10, Article IX of the Constitution."
The undertaking in the case of State of Florida v. Town of North Miami, supra, is small and inconsequential in comparison with the case now before the Court. The proposal in this case is that six and one-half acres of land owned by private individuals be acquired in fee simple by a public body with public funds and after buildings thereon which they alleged to be worth nothing are torn down  to redevelop the area into a gigantic real estate promotion scheme. It is not simply for one business but it is for many businesses. One part of the property is to be developed and sold for retail commercial establishments, another for wholesale commercial establishments, another for warehousing and storage, and another for industries and small manufacturing plants.
In other words, in order to tear down, remove, or cause to be demolished some dilapidated buildings in a blighted area, the fee simple title to the land in the area must be acquired in order to promote commercial and industrial enterprises and in order to go into competition with free enterprise.
It is quite clear and we hold that Chapter 23077, Acts of 1945, and the proceedings taken under it by the appellee, as shown by this record, violates the Constitution of the State of Florida in the following particulars:
(1) Section 1 of the Declaration of Rights in that the inalienable right of the citizen to acquire, possess and protect property would be denied; public authorities would be permitted to take one man's property against his will and make it available to another group for their private purpose rather than a public use,
(2) Section 12 of the Declaration of Rights and Section 29 of Article XVI in that the taking of private property for a purpose or use not public, to wit, for the purpose of selling or leasing the same for private use, profit and gain to other individuals, corporations or associations is attempted to be authorized and consummated,
*671 (3) Section 5 of Article IX in that the expenditure of public funds and the assessment and imposition of taxes for a purpose not public nor municipal would be authorized,
(4) Section 10 of Article IX in that an attempt is made to authorize and consummate the appropriation of public or municipal funds or money, or the loaning of credit of a municipality to corporations, associations, institutions, or individuals for a purpose not public nor municipal and for private gain and profit.
Reversed with directions to set aside the order dismissing the bill of complaint and for further proceedings in accordance with this opinion.
SEBRING, C.J., and THOMAS, HOBSON and ROBERTS, JJ., concur.
TERRELL, J., dissents.
TERRELL, Justice (dissenting).
The majority opinion proceeds on the theory that Chapter 23077, Acts of 1945, Section 421.08 note, F.S.A. providing for the acquisition of "blighted areas" in municipalities and making them available for redevelopment purposes, is violative of various and sundry provisions of the Constitution, because some of the lands acquired may become available for purchase and development by private enterprise.
Constitutional, like many other questions, often turn on factual circumstances and the results the answer to them produces. I think a look at the photographs filed in evidence is a complete answer to every objection advanced in the majority opinion. "Blighted Areas" as defined by Chapter 23077 are such as are marked by slums or which, from age, deterioration, dilapidation, obsolescence, overcrowding, faulty construction or design, lack of ventilation, light or sanitary facilities, obsolete layout, or a combination of these and other factors, the buildings have become detrimental to the safety, health, morals or welfare of the community. They are known to impair economic values and tax revenues, cause an increase in crime and the spread of disease. They increase infant mortality, juvenile delinquency and poverty and they are a menace to health, safety, morals, and the general welfare. They necessitate excessive and disproportionate expenditure of public funds for crime prevention and punishment, for public health and safety and for fire and accident protection. They do not pay their proportionate part of the taxes, but are in fact, an inordinate drain on the tax revenues of the community.
The record discloses that the "blighted area" in question possesses many, if not all, of these factors. From the photographs one might think it was a dilapidated turpentine still or saw mill "quarters," abandoned by the owner and preempted by bats, bed bugs and billy goats. Chapter 23077 was designed to reclaim such areas and make them available for "use by private enterprise or public agencies in accordance with the redevelopment plan." The act defines such a plan and imposes limitations for acquisition and disposition of the lands to protect the owner and the public. There is no showing that the redevelopment plan as defined by the act is not being followed, or that any one is being financially hurt.
I yield to no one in my devotion to private enterprise and the sanctity of property rights, as protected by the constitution, but I cannot look at the photographs and record in this case and point out where the sanctity of property rights is being violated by the act or the plan of development. Neither do I think the constitution was intended to be construed so as to condemn a community to live in eyeshot of a social blight like that revealed by the record, particularly when the legislature has provided a reasonable and approved means to remove it. This court is not the sole guardian of the constitution. The legislature takes the same oath to protect and defend it that we do, hence their acts are clothed with the presumption of validity. It is our duty to indulge every presumption in favor of their validity and to search for reasons to uphold, rather than to strike them down.
When the Federal and State Constitutions were adopted, there was not a community in the State or nation as large as *672 Daytona Beach, the origin of this litigation. Neither was there any such thing as a "blighted area" in the country at that time. When the legislature promulgates an act to remove such evils, the constitution should be construed to uphold the act when violence to individual rights is not shown. No such showing is made here, and fifteen or twenty courts of last resort in the country have upheld acts of similar import. To contend that the same relief could be secured by invoking the police power instead of the power of eminent domain, is begging the question. The legislature provided a way that is reasonable. If the redevelopment plan covers more than is justified, or is being executed in a way not just, neither of which is charged, the law affords an ample remedy. There is nothing in the act to prevent the original owners from recovering their property for redevelopment purposes if they desire.
The act in terms prohibits any speculation in land holding and makes ample provision to relocate and take care of those who may be displaced. The governing authority of the City is required to approve the appropriation and the redevelopment plan. In fact, every safeguard and precaution is taken to prevent any of the causes that the majority opinion is predicated on. This Court is committed to the doctrine that it will not go behind the finding of a City planning board and overthrow a zoning ordinance, even though it is shown to depreciate property values.
I do not think the makers of the constitution ever intended that instrument to be construed so as to make it a barrier to any community in removing filth, unsanitary places or other conditions that contribute to crime, deteriorate the public morals or which cause an inordinate drain on the tax revenues for police protection to counteract these and kindred influences. I think the community should be upheld where it is authorized to, and does in fact, move against these evils. I therefore dissent.