928 So.2d 1281 (2006)
Maureen FULMORE, Appellant,
v.
CHARLOTTE COUNTY and Murdock Village Community Redevelopment Agency, Appellees.
Donald and Lela Replogle, Appellants,
v.
Charlotte County and Murdock Village Community Redevelopment Agency, Appellees.
Keryn P. Newman, Appellant,
v.
Charlotte County and Murdock Village Community Redevelopment Agency, Appellees.
Lewis J. Dorsch, Appellant,
v.
Charlotte County and Murdock Village Community Redevelopment Agency, Appellees.
Janette McGibbon, Appellant,
v.
Charlotte County and Murdock Village Community Redevelopment Agency, Appellees.
Tamora A. Trainor-Kozak as sole heir of William P. Trainor and Marlene E. Trainor, Judith A. Hoover, Allana Kondisko and Joseph R. Kondisko, Appellants,
v.
Charlotte County and Murdock Village Community Redevelopment Agency, Appellees.
Raymond and Kevin Lee, Appellants,
v.
Charlotte County and Murdock Village Community Redevelopment Agency, Appellees.
Allen J. Wagner and Melvin Schlauch, Appellants,
v.
Charlotte County and Murdock Village Community Redevelopment Agency, Appellees.
Genevieve M. Blair, Appellant,
v.
Charlotte County and Murdock Village Community Redevelopment Agency, Appellees.
Estate of Mariann L. Burke and Woodland Development Group, LLC, Appellants,
v.
Charlotte County and Murdock Village Community Redevelopment Agency, Appellees.
Dawn Morales, Appellant,
v.
Charlotte County, and Murdock Village Community Redevelopment Agency, Appellees.
Curtis D. Cumming and Ruth A. Cumming, Bruce L. Tippin, James D. Tippin, and William W. Dugan, Appellants,
v.
Charlotte County and Murdock Village Community Redevelopment Agency, Appellees.
Curtis D. Cumming, Ruth A. Cumming, Bruce L. Tippin, James D. Tippin, William W. Dugan, Edward DePaiva, Elizabeth DePaiva, and Teresa Berchtold, Appellants,
v.
Charlotte County and Murdock Village Community Redevelopment Agency, Appellees.
Nos. 2D04-3179, 2D04-3283, 2D04-3293, 2D04-3429, 2D04-3430, 2D05-13, 2D05-17, 2D05-24, 2D05-29, 2D05-2708, 2D05-3315, 2D05-4156, 2D05-4159.
District Court of Appeal of Florida, Second District.
May 31, 2006.
*1283 S. William Moore and Amy Brigham Boulris of Brigham Moore, LLP, Miami, for Appellants Maureen Fulmore, Lewis J. Dorsch, Janette McGibbon, Tamora A. Trainor-Kozak, Marlene E. Trainor, Judith A. Hoover, Allana Kondisko, Joseph R. Kondisko, Raymond Lee, Kevin Lee, Allen J. Wagner, Melvin Schlauch, Genevieve M. Blair, Curtis D. Cumming, Ruth A. Cumming, Bruce L. Tippin, James D. Tippin and William W. Dugan.
Ellen J. Neil of Gaylord, Merlin, Diaz, and Bain, Boca Grande, for Appellants Donald and Lela Replogle and Keryn P. Newman.
No appearance for Appellants Edward DePaiva, Elizabeth DePaiva and Teresa Berchtold.
John H. Pelzer and Robert J. Gill of Ruden, McClosky, Smith, Schuster & Russell, P.A., Fort Lauderdale, for Appellees.
Valerie A. Fernandez, Coral Gables, for Amicus Curiae Pacific Legal Foundation.
WHATLEY, Judge.
The Appellants (the Landowners) in these consolidated cases challenge the trial court's orders rejecting their constitutional challenge to the Community Redevelopment Act of 1969 (the Act), §§ 163.330.463, Fla. Stat. (2003), and allowing the taking of their property through the exercise of the power of eminent domain as authorized by the Act. We affirm.
In the findings and declaration of necessity provision of the Act the legislature stated in pertinent part that
there exist in counties and municipalities of the state slum and blighted areas which constitute a serious and growing menace, injurious to the public health, safety, morals, and welfare of the residents of the state; that the existence of such areas ... constitutes an economic and social liability imposing onerous burdens which decrease the tax base and reduce tax revenues, substantially impairs or arrests sound growth ... aggravates traffic problems, and substantially hampers the elimination of traffic hazards and the improvement of traffic facilities; and that the prevention and elimination of slums and blight is a matter of state policy and state concern....
§ 163.335(1).
It is further found and declared that the powers conferred by this part are for public uses and purposes for which public money may be expended and the power of eminent domain and police power exercised, and the necessity in the public interest for the provisions herein enacted is hereby declared as a matter of legislative determination.
§ 163.335(3).
To effect the elimination of slums and blight,[1] which conditions are specifically *1284 defined by the Act, §§ 163.340(7), (8), the Act authorizes counties and municipalities to exercise the power of eminent domain to acquire areas they have designated as community redevelopment areas. § 163.375. Before doing so, the governing body must adopt a resolution supported by data and analysis that makes a legislative finding that slum or blight conditions exist and that redevelopment is necessary in the interest of the public health, safety, morals, or welfare of the residents of the county or municipality. § 163.355. The Act specifically promotes the involvement of private enterprise:
Any county or municipality, to the greatest extent it determines to be feasible in carrying out the provisions of this part, shall afford maximum opportunity, consistent with the sound needs of the county or municipality as a whole, to the rehabilitation or redevelopment of the community redevelopment area by private enterprise.
§ 163.345. See also Kelo v. City of New London, Conn., ___ U.S. ___, ___, 125 S.Ct. 2655, 2664, 162 L.Ed.2d 439 (2005) ("Our opinion [in Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 244, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984)] also rejected the contention that the mere fact that the State immediately transferred the properties to private individuals upon condemnation somehow diminished the public character of the taking. `[I]t is only the taking's purpose, and not its mechanics,' we explained, that matters in determining public use.").
In May 2003, the Charlotte County Board of County Commissioners adopted a resolution authorizing and directing the use of consulting expertise to analyze whether an area in the unincorporated West Murdock area of Charlotte County constituted an area of slum or blight as defined in the Act. Two weeks later, the Board held a public hearing at which it was presented uncontradicted evidence of blight by the manager of Charlotte County's Utilities Department, the County's supervisor of code enforcement, the County's transportation engineer, the County's director of real property services, and a private land planner with Real Estate Research Consultants. After hearing from the public, the Board approved unanimously a resolution containing findings of blight, declaring the 1100-acre redevelopment area to be a blighted area in need of redevelopment in the interest of the public health, safety, morals, or welfare, and designating the redevelopment area appropriate for community redevelopment. The resolution stated that in addition to the testimony of staff and the expert and the finding of necessity report prepared by Real Estate Research Consultants, the Board relied on its own knowledge of the conditions in the redevelopment area. Pursuant to section 163.356, the Board created the Murdock Village Community Redevelopment Agency (the Agency) to carry out the redevelopment purposes of the Act, including exercising the power of eminent domain. The Board declared itself to be the governing body of the Redevelopment Agency, as it was authorized to do under section 163.357.
The redevelopment area was first platted almost forty years ago. It now consists of approximately 3000 platted lots, *1285 roughly seventy-seven residential homes, and sixteen developed commercial properties. By way of historical background, the finding of necessity report states the following:
[Charlotte County's] recent past identifies the area as among the state's largest concentrations of platted but undeveloped or unimproved lots. These are typically substandard properties without adequate infrastructure or access to many public services. To the degree the deficiencies appear only aesthetic in the short term, they are likely to preclude orderly development over time and are incapable of accommodating the intensity of development activity for which they were originally platted.
The character of these lots reflects Florida's boom and bust real estate cycles that encouraged financially irresponsible land speculation, usually in conjunction with habitat destruction, poor design, and inadequate infrastructure. Aggressive sales techniques and occasionally malfeasant, if not overtly fraudulent, practices opened Florida real estate and the prospect of increasing land values to virtually everybody in the United States. Such land development and sales practices continued almost unabated throughout the middle part of this century when court and legislative action injected some control and oversight.
The remnants of relatively unrestricted development remain behind for Florida's contemporary local and county jurisdictions to monitor and to correct. Even today, almost 40 years after the Redevelopment Study Area was developed and initially sold, fewer than 40 acres support residential or commercial structures. An additional 28 acres have been used by churches and utilities. Public lands and parks consume another 117 acres, leaving almost 800 acres of land undeveloped and underutilized. The virtual absence of development activity in the Redevelopment Study Area, given its proximity to one of the region's largest concentrations of commercial activity, points to the materially unsatisfactory conditions within the study area. In the five years ending in 2002, the population of Charlotte County grew by some 15,000 people. During this period, there were an average of some 2,000 housing units produced each year. As this pace of development has occurred throughout the County, fewer than 80 homes have been built in the Redevelopment Study Area. For the five-year period, 1996 to 2000, there were almost 2,000,000 square feet of commercial buildings placed in service in Charlotte County. To date, there have been about 20-25 commercial structures built in the Redevelopment Study Area.
After successfully negotiating the voluntary acquisition of some of the lots in the redevelopment area, in January 2004, the Agency began filing eminent domain petitions to condemn the remaining parcels. Several affected landowners filed a declaratory judgment action raising, inter alia, facial and as-applied constitutional challenges to the Act. Other landowners asserted the same constitutional challenges by way of answers, affirmative defenses, and counterclaims to the Agency's petitions.
The Agency moved to dismiss the declaratory judgment action, and the trial court dismissed the action insofar as it challenged the facial constitutionality of the Act, but reserved ruling on the as-applied challenge. After an evidentiary hearing on the condemnation petitions, the landowners' defenses, and the remaining declaratory relief claims, the trial court issued orders finding that the Act was not unconstitutional either facially or as-applied *1286 and granting the takings. The landowners filed timely appeals, raising only the constitutional issues they had raised in the trial court. This court consolidated all of the appeals for review.
Article X, section 6(a) of the Florida Constitution provides in pertinent part that "[n]o private property shall be taken except for a public purpose." Whether a taking satisfies the public purpose limitation is a judicial question. Adams v. Housing Auth. of Daytona Beach, 60 So.2d 663, 669 (Fla.1952).
While the Legislature may, in providing for the condemnation of private property, determine in the first instance whether the use for which it is proposed to allow the condemnation is a public use, and such determination will be accorded great weight by the courts, this legislative determination is not final. It is universally held that whether a particular use is public or not is a judicial question.
Wilton v. St. Johns County, 98 Fla. 26, 44, 123 So. 527, 533 (1929). Constitutional issues are reviewed de novo. Connor v. State, 803 So.2d 598, 605 (Fla.2001); Florida Dep't of Revenue v. City of Gainesville, 918 So.2d 250 (Fla.2005). "[S]tatutes come to the Court `clothed with a presumption of constitutionality,' and ... the Court should give a statute a constitutional construction where such a construction is reasonably possible." Bush v. Holmes, 919 So.2d 392, 405 (Fla.2006) (quoting City of Miami v. McGrath, 824 So.2d 143, 146 (Fla.2002)).
The Landowners argue that the Agency's condemnation of their property does not serve a public purpose because their property is not blighted. They further argue that their property is not blighted because the definition of "blighted area," § 163.340(8), is unconstitutionally vague, both facially and as applied. The Landowners do not argue that the intention of the Act to eliminate blighted areas does not serve a public purpose.[2] Thus, implicit in the Landowners' argument is an acknowledgement that if the redevelopment area meets the definition of "blighted area," the public purpose requirement is satisfied. See Baycol, Inc. v. Downtown Dev. Auth., 315 So.2d 451, 455 (Fla.1975) ("There may be indeed a desirable purpose in the eyes of some to clear away old areas in a city but the necessary prerequisites must be present for necessary public purpose....").
Section 163.340(8) states as follows:
(8) Blighted area means an area in which there are a substantial number of deteriorated, or deteriorating structures, in which conditions, as indicated by government-maintained statistics or other studies, are leading to economic distress or endanger life or property, and in which two or more of the following factors are present:
(a) Predominance of defective or inadequate street layout, parking facilities, roadways, bridges, or public transportation facilities;
(b) Aggregate assessed values of real property in the area for ad valorem tax purposes have failed to show any appreciable increase over the 5 years prior to the finding of such conditions;
(c) Faulty lot layout in relation to size, adequacy, accessibility, or usefulness;

*1287 (d) Unsanitary or unsafe conditions;
(e) Deterioration of site or other improvements;
(f) Inadequate and outdated building density patterns;
(g) Falling lease rates per square foot of office, commercial, or industrial space compared to the remainder of the county or municipality;
(h) Tax or special assessment delinquency exceeding the fair value of the land;
(i) Residential and commercial vacancy rates higher in the area than in the remainder of the county or municipality;
(j) Incidence of crime in the area higher than in the remainder of the county or municipality;
(k) Fire and emergency medical service calls to the area proportionately higher than in the remainder of the county or municipality;
(l) A greater number of violations of the Florida Building Code in the area than the number of violations recorded in the remainder of the county or municipality;
(m) Diversity of ownership or defective or unusual conditions of title which prevent the free alienability of land within the deteriorated or hazardous area; or
(n) Governmentally owned property with adverse environmental conditions caused by a public or private entity. However, the term blighted area also means any area in which at least one of the factors identified in paragraphs (a) through (n) are present and all taxing authorities subject to s. 163.387(2)(a) agree, either by interlocal agreement or agreements with the agency or by resolution, that the area is blighted. Such agreement or resolution shall only determine that the area is blighted. For purposes of qualifying for the tax credits authorized in chapter 220, blighted area means an area as defined in this subsection.
The Landowners argue that factors (a) and (c) through (f) are subjective and nonquantifiable, but that factors (g) through (n) are objective and quantifiable.[3] "[A] facial challenge for vagueness will be upheld only if the enactment is impermissibly vague in all of its applications." Brown v. State, 629 So.2d 841, 843 (Fla. 1994) (citing Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495-96, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)). The Landowners' acknowledgement that several of the blight factors are objective and quantifiable necessarily means that section 163.340(8) is not vague in all of its applications. Thus, their facial constitutional challenge fails. We shall next address their as-applied constitutional challenge.
Assessing the constitutionality of section 163.340(8) as applied to the Landowners involves a mixed question of law and fact because the trial court made findings regarding whether the Agency presented sufficient evidence to establish that the redevelopment area was a blighted area. "[M]ixed questions of law and fact that ultimately determine constitutional rights should be reviewed by appellate courts using a two-step approach, deferring to the trial court on questions of historical fact but conducting a de novo review of the constitutional issue." Connor, 803 So.2d at 605. Findings of fact are reviewed for clear error. Id. (quoting Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)). We note that the Landowners made no effort to show that the findings of *1288 blight were not supported by substantial competent evidence.
The Landowners argue that the Agency failed to present evidence to satisfy the deteriorated or deteriorating structures requirement in the first or predicate part of the definition of "blighted area" because the word "structures" refers to buildings only. They argue that the Agency admitted through the testimony of Owen Beitsch, a planner and real estate analyst with Real Estate Research Consultants, the entity that prepared the finding of necessity report, that it was relying on the allegedly deteriorating condition of the roads and drainage system to satisfy the deteriorating structures requirement. Beitsch testified that they were defining "structures" to mean roads, streets, and supporting infrastructure.
The Agency asserts that the legislature did not intend to restrict the definition of structures to buildings. It argues that if the legislature wanted to specify buildings, it would have, as evidenced by its use of the word "buildings" in the definition of slum area. 163.340(7). Indeed, in section 163.340(7), the legislature defined slum area in pertinent part as follows: "an area having physical or economic conditions conducive to disease, infant mortality, juvenile delinquency, poverty, or crime because there is a predominance of buildings or improvements, whether residential or nonresidential, which are impaired by reason of dilapidation, deterioration, age, or obsolescence...."
We agree that the legislature's specific reference to a predominance of impaired buildings as part of the evidence necessary to establish a slum area reveals that its reference to a substantial number of deteriorated structures as part of the evidence necessary to establish a blighted area was intended to mean something more than deteriorated buildings. That something more includes roads and infrastructure. Infrastructure is defined as "the large-scale public systems, services, and facilities of a country or region that are necessary for economic activity, including power and water supplies, public transportation, telecommunications, roads, and schools." Encarta World English Dictionary (2005). We believe that the stated purpose of the Act to redevelop slum or blighted areas of the state that are decreasing the tax base, substantially impairing sound growth, and aggravating traffic problems, 163.335(1), reveals that the legislature's use of the word "structures" in section 163.340(8) encompasses infrastructure, which includes roads.
The Landowners argue that "structures" was not meant to refer to roads because the first factor set forth in the second part of the definition of blight includes roadways. We disagree because the specified condition of "structures" is different from the specified condition of "roadways." In other words, while roads and roadways are synonymous, a substantial number of deteriorated or deteriorating roads is a different concept than a predominance of defective or inadequate roadways.
We now turn to the additional requirement of section 163.340(8) that two or more of the enumerated factors be present. The Agency presented evidence to support seven of the fourteen factors, but the trial court found that the evidence supporting two of those factors was deficient. We will address each of the five factors the court found present to justify the designation of the redevelopment area as a blighted area. We note that in addition to hearing testimony and arguments, the trial court visited the area with the parties.
Regarding factor (a), the trial court found there was a predominance of defective *1289 or inadequate roadways and bridges as well as street layout in that there is no connectivity between segments of the redevelopment area by east-west arteries, there is limited north-south access, and to go from one segment of the area to another sometimes requires use of major highways. The court also found that there were no bridges over canals.
The finding of necessity report elaborates that the redevelopment area is divided by two major canals, and there are no local roads providing access between the east and west portions of the area. The lack of satisfactory internal connections forces traffic onto perimeter roads, which adds unnecessary and potentially dangerous trips to those roads. The report states that the road grid in the redevelopment area has deteriorated to the point that repair is not justified, and the width, depth of bed, and composition of materials do not satisfy current road design standards. Periodic ponding reveals the need for drainage solutions that are expensive and are usually undertaken during reconstruction. Finally, the report states that the lack of sidewalks raises serious safety concerns for pedestrians, and the existing road grid precludes provision of sidewalks without expensive reconstruction.
Regarding factor (c), the trial court found that the finding of necessity report provided ample evidence of faulty lot layout in relation to size, adequacy, accessibility, or usefulness. The finding of necessity report to which the court referred states:
The Redevelopment Study Area is not an area of open land easily reconfigured to other purposes or activities. The intensity of plats, their size and the character or condition of existing structures impart a distinctly deficient pattern of development that precludes sound standards, design, and overall sanitary and safe conditions. These development patterns and conditions will only be reinforced over time if not aggressively altered.
As now planned, the area's zoning and platting could potentially yield as many as 4,900 units of single and multi-family housing with a minimum density of 3.5 units to the acre. The future land use map, however, calls for fewer units and lower densities overall....
The report also states that the commercial lots are inadequate because of their size and cause an increased number of ingress and egress points on major roads, as well as an inability to provide landscaping to buffer adjacent residential areas. In addition, the report expresses concern that the gross number of commercial lots is disproportionate to the number of users who would consider acquiring such lots  "In today's competitive environment, contemporary development practices favor larger sites to vary and mix uses and activities. Although each non-residential site may be buildable, in the aggregate the commercial lots are largely economically dysfunctional or deteriorated because they simply do not meet contemporary design and investor requirements."
Regarding factor (d), unsafe or unsanitary conditions, the trial court found that the Agency presented ample evidence that, due to the absence of water or sewer service in the redevelopment area, a health hazard would result if the area was built out because each lot would require a well and a septic tank.
The finding of necessity report elaborates that septic systems are not viewed favorably by regulators or health officials, and the state has encouraged Charlotte County to eliminate all septic systems. Because individual septic systems are monitored by their users, they frequently fail, resulting in the risk of infiltration of wells. This health risk is increased in the *1290 redevelopment area because it is an area of flooding or ponding and septic systems underperform in such areas. Because individual wells are also monitored by their users, a centralized public water supply is preferred because of the ability to continuously monitor for quality. The report concludes that elimination of individual septic systems and wells is a matter of great public concern regarding the public health, safety, and welfare.
With regard to unsafe conditions, the report also points to the lack of sidewalks and the fact that the road grid causes unnecessary use of perimeter roads, subjecting more residents to the potential for accidents. "Today's contemporary planning approaches recognize the need to capture internal trips as a means of achieving neighborhood safety." In addition, the report states that illegal dumping in the area is estimated by county officials to affect up to 25 of the undeveloped and vacant parcels. It notes that dumping creates visual blight, may pose a health and safety risk to children, and may become a breeding ground for vermin.
Regarding factor (e), deterioration of site and other improvements, the trial court found that there is an accumulation of dumped household appliances, construction materials, and horticultural trimmings. Drainage is inadequate because roadside swales allow storm water to flow over streets, which are depressed to allow this rather than having culverts to move the water under the streets. Standing water has left cracks in the streets as well as soil on the depressed portions of the streets.
The finding of necessity report repeats that the road grid has deteriorated to the point that simple repairs are not justified. Many of the commercial improvements are nearing or have reached the end of their useful economic life and are functionally deteriorated, with parking and access being clearly deficient.
Finally, regarding factor (f), the trial court found that the finding of necessity report contained substantial competent evidence of outdated and inadequate building density patterns. The report lists that evidence as follows:
Planned density relative to the size and adequacy of platted lots
Absence or deterioration of most infrastructure
Sub standard materials or specifications related to that infrastructure which is in servcie [sic]
Poor connectivity among neghborhoods [sic] prompting the use of regional arterials for local travel
No sidewalks
No designated public spaces save those that have been contributed recently by the County
No provisions for schools
Unrestricted and divided ingress and egress among numerous commercial properties
Commercial intrusion into residential areas stemming from inadequate lot depth, poor design contols [sic], and the asbence [sic] of transtional [sic] zones that preclude opportunities to insert buffering.
As the preceding discussion reveals, there was substantial competent evidence presented by the Agency to support the trial court's findings that the respective blight factors were established. Thus, the trial court's findings of fact were not clearly erroneous. While some of the qualifiers used in section 163.340(8) could allow for arbitrary application of some of the blight factors, that has not occurred here in light of the overwhelming evidence supporting the respective factors. Accordingly, the application of section 163.340(8) to the particular *1291 circumstances of this case was not unconstitutional.
There is a second definition of "blighted area" in section 163.340(8). It provides that a blighted area may also be found where only one of the enumerated factors is present and all of the taxing authorities subject to section 163.387(2) agree with the redevelopment agency's determination of blight. The parties stipulated that Charlotte County is the only taxing authority subject to section 163.387(2), and it and the Murdock Village Redevelopment Agency, which is the Charlotte County Board of County Commissioners, entered into the required interlocal agreement. Section 163.357 allows the Board to be the Agency. The result here is that the County agreed with its own blight determination. As we have shown, more than one of the blight factors was proven. Accordingly, the application of the second definition of blight in section 163.340(8) to the particular circumstances of this case was not unconstitutional.[4]
Affirmed.
NORTHCUTT, J., Concurs.
KELLY, J., Concurs in result only.
NOTES
[1] We note that while the Act allows for the exercise of the power of eminent domain to take property for community redevelopment, § 163.340(9), Fla. Stat. (2003), the government must first prove that the area meets the definition of slum or blighted area. In contrast, the recent highly publicized United States Supreme Court opinion regarding the exercise of the power of eminent domain involved a municipal development statute that "expressed a legislative determination that the taking of land, even developed land, as part of an economic development project is a `public use' and in the `public interest.'" Kelo v. City of New London, Conn., ___ U.S. ___, ___, 125 S.Ct. 2655, 2660, 162 L.Ed.2d 439 (2005). No allegation of blight was made, id. at 2660; the area in which the petitioners' property was located was declared economically distressed. Id. at 2658. "Promoting economic development is a traditional and long accepted function of government. There is, moreover, no principled way of distinguishing economic development from the other public purposes that we have recognized." Id. at 2665.
[2] We note that the supreme court declared that the 1977 version of chapter 163, "authorizing redevelopment projects involving expenditure of public funds, sale of public bonds, the use of eminent domain for acquisition and clearance, and substantial private and commercial uses after redevelopment, is in furtherance of a public purpose and is constitutional." State v. Miami Beach Redevelopment Agency, 392 So.2d 875, 891 (Fla. 1981).
[3] The Landowners do not categorize factor (b) one way or the other.
[4] We note that at oral argument, the Landowners argued that the second definition of blight is ambiguous because the statute is not clear as to whether the predicate requirement of a substantial number of deteriorated or deteriorating structures is required in addition to the one factor and the agreement among the taxing authorities. We disagree. Section 163.340(8) begins by stating, "`Blighted area' means," and the last paragraph begins by stating, "[h]owever, the term `blighted area' also means." The clear import of this language is an intent to set forth alternative definitions of "blighted area."