315 So.2d 451 (1975)
BAYCOL, INC., Petitioner-Appellant,
v.
DOWNTOWN DEVELOPMENT AUTHORITY OF the CITY OF FORT LAUDERDALE, a Public Corporation, Respondent-Appellee.
No. 45103.
Supreme Court of Florida.
June 23, 1975.
Rehearing Denied July 28, 1975.
*452 Elliott Harris of Lopez & Harris, Miami, for petitioner-appellant.
Frank L. Watson, of Freeman, Richardson, Watson, Slade, McCarthy & Kelly, Jacksonville, Cecil T. Farrington, and Ross, Norman & Cory, Fort Lauderdale, for respondent-appellee.
PER CURIAM.
This cause appears on certiorari granted to review the decision of the District Court of Appeal, Fourth District, in Baycol, Inc. v. Downtown Development Authority of City of Fort Lauderdale, 288 So.2d 309 (Fla.App. 4th 1974), which conflicts with Adams v. Housing Authority of City of Daytona Beach, 60 So.2d 663 (Fla. 1952). We have jurisdiction pursuant to Article V, Section 3(b)(3), Florida Constitution.
The salient facts are as follows: On Aug. 19, 1971, the Board of the Downtown Development Authority of Fort Lauderdale, a public corporation of the State of Florida (hereafter referred to as DDA), passed a resolution to provide for a bond election on the question of the issuance of special obligation bonds not exceeding $12,500,000 for the following stated purpose:
"To finance the case of acquiring and constructing improvements to provide *453 traffic access, traffic flow and traffic circulation within said district including parking facilities, street improvements, overhead crosswalks, sidewalks, street lighting, storm drains, bridges, and transportation terminals, more particularly described in the Fort Lauderdale Central Area Study by Victor Gruen, 1967, as revised and modified, (hereinafter called `project') and on file with the Director of the Authority." (Emphasis added.)
It is important to note that the official ballot promulgated for use in the bond election contained identical language of purpose with one significant exception  the reference to the Gruen study was deleted and the following substituted:
"As more particularly described and provided in the Resolution of the Authority adopted by its Board on August 19, 1971."
Approximately three weeks before the bond election, the DDA ran a display advertisement of the revised Gruen plan in the local newspaper and mailed an artist's sketch of the project to voters. This plan provided that a small downtown area would be converted to a parking garage. The petitioner's property was not depicted in the drawing.
Approximately two weeks before the bond election, the DDA had a tentative general site plan prepared by Johnson & Asso. which significantly enlarged the maximum possible boundaries of the proposed project. The possibility that petitioner's property might be included was raised for the first time. Copies of the new plan were posted in the DDA office and displayed at the polling place, but no attempt was made to mail voters a sketch of the plan or to provide newspaper coverage.
The bond issue was approved by the voters on September 28, 1971. Four months later, another Johnson plan was adopted by the DDA. This plan deleted the Governor's Club Hotel property as an economy measure, but substituted the highly expensive Baycol property in its place. The effect of this bit of gerrymandering was to create an oddly shaped parking facility, four and a half blocks square, in the center of downtown Fort Lauderdale. No apparent attempt was made to publicize this latest revision either.
On March 2, 1972, the DDA filed a complaint to validate the bonds, alleging that the purpose of the bonds was to finance the cost of "acquiring and constructing" certain traffic and parking improvements in accordance with the revised Gruen study. No mention was made of the recent Johnson updates. A show cause order was issued the same day and published in the local newspaper. This notice made no reference to prospective land acquisition pursuant to a plan of any kind. The only response filed in the action was an answer by the State Attorney. On March 29, 1972, the final judgment validating the bonds was entered.
Within the next six months, the executive director of the DDA, acting on the instructions of the Board, began negotiating with several developers about constructing a shopping mall above the parking garage. Detailed information regarding this new downtown development began appearing regularly in the local news media. Petitioner Baycol and two other affected property owners complained to the DDA about this proposed use of their property.
In October 1972, the DDA initiated an eminent domain proceeding to condemn the property included in the latest Johnson plan for the purpose of constructing a parking facility. Petitioner and other property owners contested the proceeding, alleging that the primary purpose was to construct a shopping mall in furtherance of private interests. The trial court took the testimony of several witnesses and admitted the following documents into evidence: The final judgment validating the bonds and four sets of proposals of the use *454 of the property, the most recent of which depicted a shopping center above the parking garage. These exhibits are part of the record proper, and are subject to judicial review in this cause. Seaboard Air Line Railroad Co. v. Branham, 104 So.2d 356 (Fla. 1958); Foley v. Weaver Drugs, Inc., 177 So.2d 221 (Fla. 1965).
On December 18, 1972, an order of taking was entered by the trial court and was later affirmed by the Fourth District Court of Appeal in Baycol, supra, now before us for review.
Petitioner urges conflict with our holding in Adams, supra, wherein we held that private property may not be acquired by eminent domain if the primary purpose is to develop and dispose of the property to private persons for commercial and industrial purposes.
The threshold question is whether petitioner is estopped from attacking the purpose of the land acquisition in the eminent domain proceeding because the final judgment validating the bonds was inclusive of funds for the land acquisitions. The key to this determination vests in the adequacy of the notice afforded by the bond resolution and related proceedings.
In State v. City of Boca Raton, 172 So.2d 230 (Fla. 1965), we found that a resolution authorizing the issuance of the bonds and the evidence adduced at the hearing, together with the plans and specifications prepared by the Capital Improvements Advisory Committee of the City of Boca Raton referred to in the resolution and a part of the public records of the City, were sufficient to give the citizens and taxpayers adequate knowledge concerning the purposes for which the bonds were to be issued. We were satisfied that the notice requirements of Chapter 74, Florida Statutes, were offered. Cf. State v. Manatee County Port Authority, 171 So.2d 169 (Fla. 1965). That resolution provided specifically for the purchase and acquisition of certain recreational facilities and for the purchase and acquisition of lands and rights-of-way for streets, and for the purchase of land for a city waste dump, all to be carried out pursuant to a detailed set of plans. Landowners were plainly put on notice that specified properties would be taken by eminent domain with the acquisitions funded from the bond proceeds. By contrast, the resolution in the case sub judice is so vague and indefinite that it is incapable of being reasonably construed on its face to include the condemnation of specified properties. The resolution is devoid of any language whatsoever pertaining to land acquisition, and the vague reference to a revised "study" would hardly place a landowner on notice that his property would be condemned as a direct result of the bond election. Indeed, the wording on the ballot itself, which we presume the electors studied carefully before casting their votes, did not even allude to the "study".
It is true that the voters had been submitted to a barrage of publicity three weeks prior to the election, indicating that a small downtown section would be used as a parking facility, and had received sketches in the mail to that effect. It is equally true that at the time of the election, a "general site boundary plan" was posted at the polling place. Apparently this "plan" did not purport to depict the final project but only indicated the outer perimeters of a large amorphous area that might be included in the final project. This rapid turn of events leads to the legitimate conclusion that the DDA was unable to determine at the time of the election which properties, if any, should be acquired for inclusion in the project and preferred to postpone any decision until it was assured of the passage of the bonds in question. In fact, a definite land use plan was not adopted until four months after the election, and there is no evidence that property owners were ever informed of the ultimate plan prior to the bond validation hearings. The show cause order which purported to give notice was devoid of any reference to *455 land acquisition pursuant to a plan of any nature or kind.
It might be argued that the land owners whose properties were included in the original Gruen plan had de facto notice that condemnation was imminent when a display advertisement was published in the newspaper and tenants began vacating the premises. It is clear from the testimony of one appraiser, however, that a high vacancy rate which accompanies the threat of acquisition by a condemning authority did not attach to petitioner's property until later. A portion of this testimony appears as follows:
"Q: In other words, you became aware of the threats [of acquisition] through newpaper articles?
A: Well, so-called threat, yes.
Q: I'm using your word.
A: Yes, right. But I would like to add something here. Actually, the threat to this particular block [Baycol property] was not apparent immediately because the block was not considered in the original acquisition.
Q: Yes?
A: So, if there was an effect, it should have been an appreciable effect. None was found, of course."
Thus, the petitioner, having received neither express nor de facto notice that its property was threatened with imminent acquisition in conjunction with the aforementioned bond issue, was not required to attack the propriety of the acquisition at the bond validation proceeding. Therefore, petitioner's challenge to the public purpose and necessity for the condemnation of its property in the eminent domain proceeding was both timely and appropriate.
The power of eminent domain is one of the most harsh proceedings known to the law. Consequently, when the sovereign delegates this power to a political unity or agency, a strict construction must be given against the agency asserting the power.[1] The burden is on the condemning authority to establish a public purpose and reasonable necessity for the taking.[2]
We have been long committed in a consistent series of cases to the proposition that eminent domain cannot be employed to take private property for a predominantly private use; it is, rather, the means provided by the constitution for an assertion of the public interest and is predicated upon the proposition that the private property sought is for a necessary public use.[3] It is this public nature of the need and necessity involved that constitutes the justification for the taking of private property, and without which proper purpose the private property of our citizens cannot be confiscated, for the private ownership and possession of property was one of the great rights preserved in our constitution[4] and for which our forefathers fought and died; it must be jealously preserved within the reasonable limits prescribed by law.
Applying reason to this basic proposition, our decisions have, however, consistently allowed an incidental private use where the purpose of the taking was clearly and predominantly a public purpose. One of these was the classic case of Gate *456 City Garage, Inc. v. City of Jacksonville, 66 So.2d 653 (Fla. 1953), wherein we approved the reservation in the city of the authority to lease just a filling station on the condemned property where all of the remainder was clearly a public use as a necessary parking lot for the public. The compatible service station for the cars was a mere incident to the public purpose on a large parking facility and was reasonably related to the very same public purpose of cars being parked there and was a consistent, incidental purpose  not the initial or primary one. As it has been put in Demeter Land Co. v. Florida Public Service Co., 99 Fla. 954, 128 So. 402, 406 (1930), public use must be fixed and definite and "The public interest must dominate the private gain."
Likewise in Panama City v. State, 93 So.2d 608, 613 (Fla. 1957), the concession building occupying less than 2% of the entire City Hall and Civic Auditorium public project was reasonable, related and incidental and was accordingly approved, citing Gate City Garage, Inc. v. City of Jacksonville, supra. Similarly, a lease for a private fishing pier on a small part of a large ocean-front public area was approved in Sunny Isles Fishing Pier v. Dade County, 79 So.2d 667 (Fla. 1955). A contrary result was reached on opposite facts where the civic center in West Palm Beach was to be leased to a private corporation, thus becoming a "private use" and being denied in accordance with our consistent holdings which turn on this distinction,[5] although the holding was founded on a lack of authority in the city charter to pledge assets other than revenues of the project for payment of the bonds there involved, as the bond issue sought to do.
In Panama City v. State, supra, we upheld the power of the City of Panama City to issue revenue bonds to construct an extensive waterfront development despite the contention that a part of the project would be leased to private enterprise for its own profit. Here again we announced our established position that if the private benefit is merely incidental to the overall accomplishment of the public use then the existence of the former will not be recognized as a reason to prevent the accomplishment of the latter.
In Hanna v. Sunrise Recreation, 94 So.2d 597 (Fla. 1957), we upheld the authority of the Florida Board of Parks and Historical Memorials to lease substantial areas in a public park to a private enterprise for the conduct of an eighteen hole golf course, restaurant, swimming pool and related activities. The public use being recreation, we held that the employment of private facilities to accomplish that use did no violence to the constitution.
On the other hand, "the tail cannot wag the dog" and allow the public purpose to be only incidental to a predominantly private one, which appears to be the case here, as it was in several other instances which we have likewise struck down in the past. In City of Miami v. Miami Parking Garage, 73 So.2d 843 (Fla. 1954), we affirmed what the Supreme Court record reveals was a summary final decree holding unconstitutional Florida Special Acts 1951, c. 27725, § 3(f), which sought to authorize the City of Miami, after taking property by power of eminent domain, "to lease all or any part of such Parking Facilities upon such terms and conditions and for such terms of years as it may deem advisable to carry out the provisions of this Act," since the parking there involved was predominantly for the use of an adjoining downtown large department store (private) and was not created for a necessary use by the general public. City of West Palm Beach, supra, was another case in point. Similar denials of takings for private purposes are reflected in State v. Town of North Miami, 59 So.2d 779 (Fla. 1952), and Peavy-Wilson Lumber Co. v. Brevard County, 159 Fla. 311, 31 So.2d 483, 485, 172 A.L.R. 168 (1947).
*457 An analysis of our subsequent decisions indicates that we have drawn away from the early Adams v. Housing Authority of City of Daytona Beach, 60 So.2d 663 (Fla. 1952), which totally disallowed eminent domain to condemn a total area of real property within a project area for proposed public housing. Adams cited the earlier Peavy-Wilson Lumber Co. v. Brevard County, supra, recognizing that Peavy-Wilson did not involve a blighted area for condemnation but nevertheless took private property for an improper use for hunting and fishing rights in competition with private industry and disallowed the condemnation. Adams also cited State v. Town of North Miami, supra, which disallowed condemnation of private property to build an industrial plant on it and lease it to a manufacturing concern in private business for private gain.
The later milestone case of Grubstein v. Urban Renewal Agency of City of Tampa, 115 So.2d 745 (Fla. 1959), set the precedent subsequently recognized and followed nationally for condemnation of blighted or slum areas for public housing as a public purpose on the basis of the police power based upon proof that the area involved had become infested with crime and disease affecting the public health and welfare, which, of course, is a proper public purpose, even though subsequent housing involved some private adaptation and use for redevelopment.
In Grubstein, we crystalized the point when we wrote:
"This is so because it is settled by the previous decisions of this court under the Housing Authorities Law, Ch. 17981, Laws of Florida, Acts of 1937 [Ch. 421, Fla. Stat., F.S.A.] that the power of eminent domain may be exercised in aid of the police power to clear slum areas and construct low-rental houses thereon, `thereby removing breeding places for crime and disease, and promoting the health, safety, morals, peace and general welfare of the people.' Higbee v. Housing Authority of Jacksonville, 1940, 143 Fla. 560, 197 So. 479, 484. See also Marvin v. Housing Authority of Jacksonville, 1938, 133 Fla. 590, 183 So. 145, and Lott v. City of Orlando, 1940, 142 Fla. 338, 196 So. 313. The primary and fundamental purpose of the provisions of the Urban Renewal Law with which we are here concerned is exactly the same: the clearance of slum areas and the redevelopment thereof so as to avoid a recurrence of the slum condition and the evils attendant thereon, and to promote the health, safety, morals, and general welfare of the citizens of the City of Tampa. In the one case the redevelopment is in the form of low-cost housing for low-income groups; in the other, it is in the form of private development. But the public purpose sought to be achieved is, in principle, identical." (p. 748)
The conditions proved in Grubstein still constitute, where present, a valid distinction and seem to be the point of departure from earlier Adams which constitutes clear conflict here. This exception is not present sub judice and accordingly Grubstein is not precedent here. As noted in Grubstein, "public benefit" is not synonymous with "public purpose" as a predicate which can justify eminent domain, and that is the problem sub judice. There may be indeed a desirable purpose in the eyes of some to clear away old areas in a city but the necessary prerequisites must be present for a necessary public purpose which is not true in the circumstances here where the dominant purpose will be for private use and the public adaptation to the later to be provided parking to accommodate the shopping mall would be only "incidental" thereto. In fact, the justification cited to us to try to meet the "public necessity" which is required is that once private industry is allowed to come in, then the necessity for parking in connection with it will thereafter develop. This is getting the "cart before the horse" and will not suffice as a basis for public necessity justifying eminent *458 domain. The condemning body cannot proceed in this manner and "create" a subsequent necessity by first taking the property and applying it to a private interest which constitutes a basis for a later created "public need."
The contention of petitioner is that the pleadings and documents constituting the record proper[6] reflect that the proposed facility for which the property was to be used represents "a method by which the air space of parking sites could be utilized for retail and related facilities. The second and third sheets showing retail space and plaza deck, and the third extra sheet showing roof top service plans for trucks and service vehicles." The area involved covered approximately four square blocks of downtown Fort Lauderdale for the destruction of buildings there. Petitioner raises the question as to any logical need for parking when there are no buildings left to be accommodated. He then points out that the Authority's contention, that after they lease out space for businesses and developments that this will stimulate parking, is a self creation of a public necessity by a prior private purpose. Other documents reflected that: "the Rouse Co. developers of the shopping center will build the shops and restaurants and department stores and probably will be responsible for their own architecture and construction work", thus indicating a planned shopping mall for private industry to which the parking area, cited as a public purpose, would be merely incidental. It was also shown that the shopping mall would be leased to the Rouse Co. of Maryland, a private enterprise, and that the creation of the shopping mall was to create the need for the public parking proposed.
After conflict appeared from the record proper, we then looked at pertinent portions of the testimony which presents the following interesting exchange with respondent's witness regarding the true purpose of the taking:
"Q Excuse me, don't you know that the DDA is going to provide parking?
"A Parking for who?
"Q For everybody in that area, they are tearing down four blocks of building, at least, 35 parcels that you know of, to create parking spaces?
"A Well, actually, the 34 parcels that we did were primarily for the shopping center. I assume that's where is was going to be.
"Q What shopping center is that?
"A A mall that was to be created from 2nd Street north to Broward.
"Q I thought the purpose of this was to provide parking?
"A Well, that's part of the overall project, I assume, but I'm not completely sure of that."
The executive director of the Downtown Development Authority seeking to condemn the property involved testified in answer to inquiry regarding the need for parking that "the downtown needs a parking reservoir, a common parking reservoir" and then testified: "Now we do hope that there will be other businesses and developments stimulated by this common reservoir parking." And admitted: "There will be a temporary less need" when the buildings in the area are removed.
Thus it appears that without the private development there would be no public need for the parking cited as the sole basis for condemnation. This is a very dangerous precedent which would allow a total departure from the basic requirement that there must first be a showing of a public necessity or public use, in order for eminent domain to be utilized against private ownership as protected in our constitutions. This Court has already outlined its pattern for the public use requirement and those *459 instances or "exceptions," as in Grubstein, which apply. We here reaffirm this pattern and reject the proposed and alleged public purpose under the particular circumstances here.
The petition for certiorari is accordingly granted and the affirmance of the trial court's judgment is hereby quashed with directions to remand the cause to the circuit court with instructions to vacate the order of taking as to petitioner herein and to afford the respondent, if it so desires, an opportunity to establish, if it can, a proceeding under the rule announced in Grubstein v. Tampa, Fla., 115 So.2d 745. See also: Gate City Garage, Inc. v. City of Jacksonville, supra; Riviere v. Orlando Parking Commission for City of Orlando, 74 So.2d 694 (Fla. 1954);[7]City of West Palm Beach v. State, 113 So.2d 374 (Fla. 1959); Herr v. City of St. Petersburg, 114 So.2d 171 (Fla. 1959).
It is so ordered.
ADKINS, C.J., ROBERTS and McCAIN, JJ., and RUDD, Circuit Judge, concur.
OVERTON, J., dissents with an opinion.
OVERTON, Judge (dissenting).
I strongly dissent from the majority opinion both on our jurisdiction to consider this cause and on the merits, together with the awarding of a $35,000.00 attorney's fee to petitioner's counsel for this appeal.

Jurisdiction
The trial judge entered an order of taking in this cause on December 18, 1972. Petitioner filed an interlocutory appeal which was heard by the Fourth District Court of Appeal and per curiam affirmed without opinion on December 28, 1973. In accordance with Foley v. Weaver Drugs, Inc., 177 So.2d 221 (Fla. 1965), this type of opinion may be reviewed only when conflict clearly appears in the "record proper." The term "record proper" has a restrictive meaning. The historical definition restricts the record proper to pleadings, the process, the verdict, and the judgment, together with such matters as are made a part of the record proper by a statute or other recognized method. Clune v. United States, 159 U.S. 590, 16 S.Ct. 125, 40 L.Ed. 269 (1895). Regrettably, in this state, as Justice Thornal has said, "There is no clear-cut definition in the books and I think our cases on the subject are extremely confusing." Gibson v. Maloney, 231 So.2d 823, 832 (Fla. 1970). Generally, exhibits have never been considered as part of the record proper except those exhibits that are part of the initial pleading in the cause. We recognized in Foley v. Weaver Drugs, Inc., supra, that the transcript of the testimony is not record proper and could not be used to establish conflict jurisdiction.
It is petitioner's position that the dominant use for this project is for a private purpose, not a public purpose, and therefore the order of taking for this petitioner's land should fall. To establish an alleged conflict, the petitioner uses a portion of the deposition testimony of the executive director of respondent that it was considering the use of the air rights above the parking facility for a shopping mall. That same executive director testified the primary purpose of the project was to build a parking facility. Other than this testimony, there are no exhibits or evidence that were before the trial court to establish that the primary purpose was to build a shopping mall. Clearly, exhibits and depositions are not "record proper."
*460 The role of this Court in reviewing decisions of District Courts of Appeal by certiorari is limited by Article V, Section 3(b)(3), Florida Constitution. This Court previously stated that we are not merely a "`court of selected errors' whereby the Justices of this Court could whimsically select cases for review in order to satisfy some notion that the case would be of such importance as to justify the interest or attention of this Court." See Nielsen v. City of Sarasota, 117 So.2d 731, 734 (Fla. 1960). The decisions of the District Courts are final except under situations where review by the Supreme Court is clearly authorized by the Constitution. Our certiorari jurisdiction does not empower us to grant a petitioner a second appeal on the merits. Our role in conflict certiorari jurisdiction as stated by this Court in Florida Power & Light Co. v. Bell, 113 So.2d 697, 699 (Fla. 1959), "is to stabilize the law by a review of decisions which form patently irreconcilable precedents."
If Foley v. Weaver Drugs, supra, allows us to take jurisdiction in this type of cause, then we should reconsider that decision.
Even assuming we have jurisdiction to consider this appeal, I strongly disagree with the majority opinion in this cause on the merits.

Merits
The subject property was being taken under the authority of a Downtown Development Authority established by Chapter 69-1056, Laws of Florida, Special Acts of 1969. Pursuant to that legislation, the Authority submitted this project to the voters at a bond election on September 28, 1971. It was approved at the election, and on March 29, 1972, the Circuit Court for Broward County, Florida, validated $8,500,000 of limited tax bonds for this project. The acquiring resolution by the respondent-Authority sets forth the necessary purpose to acquire the petitioner's lands, specifically:
"Section 1: That it is deemed necessary and expedient to acquire the herein after described lands for the purpose of providing parking facilities, including acquisitions necessary to assure adequate pedestrian and vehicular access, the same being a public purpose as set forth in the enabling legislation of said Authority, Chapter 69-1056, Laws of Florida, Acts of 1969." [Emphasis supplied]
This clearly establishes the public purpose use for which the petitioner's property was taken.
I do not agree that the facts in this case show conflict with Adams v. Housing Authority of City of Daytona Beach, 60 So.2d 663 (Fla. 1952). In that case we held that the primary purpose shown by proposals and plans was not a public purpose.
We have recently held that the redevelopment of downtown areas serves a valid public purpose in City of Naples v. Moon, 269 So.2d 355, 356 (Fla. 1972). We there said:
"The legislation in question was intended to revive and preserve a business district in the City of Naples by providing for improved parking facilities. Currently the district is sliding into economic decline, and inadequate parking has been assigned as the cause... ."
In Gate City Garage v. City of Jacksonville, 66 So.2d 653 (Fla. 1953), we approved the use of bond proceeds to construct off-street parking facilities. The fact that a gasoline filling station would be leased to a private enterprise on the premises did not defeat the project.
In Koubek v. Caulfield, 213 So.2d 417 (Fla. 1968), this Court held that the City of St. Petersburg had the authority to expend public money to acquire downtown property and to enter into a long-term contract for the erection and lease of a parking facility thereon.
*461 Clearly, a municipality or other governmental authority in this state can properly condemn lands for parking facilities. Because of the possible consideration of respondent-Authority to lease the air rights above the parking facility for a shopping mall, the majority holds that this is the primary purpose for the project. There is no justification for that holding in the record. The record fails to show (a) any official action on the part of respondent to authorize a shopping mall; (b) any official action on the part of respondent to approve plans and specifications for a shopping mall; and (c) any official action on the part of respondent authorizing its officers and employees to enter into an agreement with private enterprise for the construction of a shopping mall. Even assuming that there were such authorization, I cannot understand the logic and reasoning which requires the project to be defeated for that reason. To do so is hypocritical. The majority is, in effect, saying it is all right to build a parking facility in the downtown area to serve 25 to 50 or more surrounding shops, but it is improper to build a parking facility which will serve not only the surrounding retail establishments but those retail establishments built on the deck of the parking facility and which would help pay for the facility. I see no difference. The purpose is to provide public parking for downtown retail establishments.
I further agree with the contention of the respondent that the successful collateral challenge made by the petitioner to the prior validation of the bonds for this project will cause confusion which will sweep the bond markets that deal in bonds of Florida communities, particularly those that are for downtown redevelopment purposes. The majority opinion, in effect, says that the bonds were improperly validated for a public purpose.
With reference to the appellate attorney's fees for the petitioners in this cause, it is my opinion that attorney's fees of this magnitude should not be considered summarily upon affidavits only.
I am further disturbed that the majority has allowed the petitioner to file as a part of the record in this cause a newspaper article published five months after the decision of the trial court and testimony of an appraiser which occurred not only subsequent to the trial court's order in this matter but subsequent to the Fourth District Court's opinion in this cause.
For the reasons expressed herein, I would deny the petition.
NOTES
[1] Peavy-Wilson Lumber Co. v. County of Brevard, 159 Fla. 311, 31 So.2d 483 (1947); Inland Waterway Development Co. v. City of Jacksonville, 160 Fla. 913, 37 So.2d 333 (1948).
[2] Canal Authority v. Miller, 243 So.2d 131 (Fla. 1970); Ball v. City of Tallahassee, 281 So.2d 333 (Fla. 1973); City of Lakeland v. Bunch, 293 So.2d 66 (Fla. 1974).
[3] Fla. Const., Art. X, § 6; U.S.Const., 14th Amd.; Sibley v. Volusia County, 147 Fla. 256, 2 So.2d 578 (1941); Orange County v. Fordham, 160 Fla. 259, 34 So.2d 438 (1948); Allegheny County v. Frank Mashuda Co., 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959).
[4] Fla. Const., Decl. of Rts., § 2.
[5] City of West Palm Beach v. State, 113 So.2d 374 (Fla. 1959).
[6] Foley v. Weaver Drugs, Inc., 177 So.2d 221 (Fla. 1965).
[7] In Riviere, supra, this Court reaffirmed its holding in Gate City Garage, supra, and concluded that provision for off-street parking facilities adopted by the City of Orlando is an exercise of the police power.