## HOLLYWOOD, FLORIDA COMMUNITY REDEVELOPMENT AGENCY, etc. v SAADA, et al.

### Case Nos. 88-10158, 88-10175 and 88-10178

Seventeenth Judicial Circuit, Broward County

June 20, 1989

### APPEARANCES OF COUNSEL

**Dennis A. Haas, Esquire,** Platt, Haas, Landsman, for petitioner.

**Mark S. Ulmer, Esquire,** Brigham Moore Gaylord Wilson Ulmer Schuster & Sachs, for defendants.

*Editor's Note:* The following opinion was subsequently vacated by stipulation. The ruling itself, however, involved the important area of urban redevelopment law and we are publishing it as an important framework for similar cases.

### OPINION OF THE COURT

LINDA L. VITALE, Circuit Judge.

### *ORDER AND JUDGMENT OF DISMISSAL*

The parties submitted this consolidated case for trial by the Court on

February 23, 1989, to determine the propriety of the Petitioner's proposed condemnation of the three parcels of improved property owned by the Defendants represented by Brigham, Moore, Gaylord, Wilson, Ulmer, Schuster & Sachs in the referenced cases. The Defendants, in their Answers, had contested the right of the Hollywood, Florida Community Redevelopment Agency ("CRA" herein) to take their properties from them against their will through an exercise of the power of eminent domain in these proceedings. A full day evidentiary hearing took place on February 23, 1989. Witnesses were presented by both the Plaintiff and the Defendants, and the Court has personally reviewed the documentary evidence submitted at that hearing (approximately 35 exhibits), as well as having been fully briefed on the law by both sides.

The power of eminent domain is delegated to community redevelopment agencies to acquire real property "necessary" for community redevelopment. *Fla. Stat.* 163.375(1) (1987). "Community Redevelopment" is defined as an undertaking:

"in a community redevelopment area for the elimination and prevention of the development or spread of slums and blight 1.84. . ." *Fla. Stat.* 163.340(90) (1987).

The phrase "Community Redevelopment Area" is defined as:

"A slum area, a blighted area, or an area in which there is a shortage of housing that is affordable to residents of low or moderate income, including the elderly, or a combination thereof which the governing body designates as appropriate for community redevelopment." *Fla. Stat.* 163.340(10) (1987). The statute defines a "slum area" as:

"An area in which there is a predominance of buildings or improvements, whether residential or non-residential, which by reason of dilapidation, deterioration, age, or obsolescence; inadequate provision for ventilation , light, air, sanitation, or open spaces; high density of population and overcrowding; the existence of conditions which endanger life or property by fire or other causes; or any combination of such factors is conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, or crime, and is detrimental to the public health, safety, morals or welfare." *Fla. Stat.* 163.340(7) (1987).

None of the testimony or reports or studies submitted as documentary evidence establish a factual basis that the area in question is a "slum" as defined in Chapter 163 of the Florida Statutes. Likewise, there is no

factual basis that there is a shortage of affordable housing for low income or elderly.

The primary justification asserted by the CRA for its attempted use of the power of eminent domain in this proceeding is that the area in question is a "blighted area" and that it is necessary for the CRA to condemn the subject properties in this proceeding to eliminate or prevent the development or spread of blight within the City of Hollywood. The CRA argues that the area in question has been legislatively determined by the City Commission of the City of Hollywood through Resolution No. R-79-8 to be a "blighted area" as defined in *Fla. Stat.* 163.340(8). Nevertheless, that determination, however characterized, is subject to judicial review when it is asserted as the basis for an exercise of the power of eminent domain. *City of Jacksonville v Moman,* 290 So.2d 105 (Fla. 1st DCA 1974).

At trial, the CRA asserted primarily three bases for its assertion that the subject area was a "blighted area" as defined in *Fla. Stat.* 163.340(8). The CRA presented: 1) City of Hollywood Resolution R-79-8; 2) two reports compiled by the Growth Management Department of the City of Hollywood, one dated April 16, 1977 (Plaintiff's Exhibit "B"), and the other prepared in 1978 (Plaintiff's Exhibit "I"); and 3) the opinion testimony of Mr. Lance Clark, a consultant to redevelopment agencies and the primary author of the 1977 and 1978 reports.

Since a resolution of this case requires statutory construction, this Court is guided by the rules of construction set forth by the Florida Supreme Court in *Baycol, Inc. v Downtown Development Authority of City of Fort Lauderdale,* 315 So.2d 451 (1975), where it is said:

"The power of eminent domain is one of the most harsh proceedings known to the law. Consequently, when the sovereign delegates this power to a political unit [sic] or agency, a strict construction must be given against the agency asserting the power. The burden is on the condemning authority to establish a public purpose and reasonable necessity for the taking". *Id* at 455.

The statutory definition of a "blighted area" can be met in one of two ways. The first, contained in subsection (8)(a) of *Fla. Stat.* 163.340 (1987) *requires* that the area in question contain "a substantial number of slum, deteriorated or deteriorating structures", as well as conditions which endanger life or property or other factors (listed in the statute) which substantially impair or arrest the sound growth of the community and constitute a public menace. The alternative definition of a "blighted are", recited in subsection (8)(b) of *Fla. Stat.* 163.340 (1987), is "[a]n area in which there exists faulty or inadequate street layout;

**163**

inadequate parking facilities; or roadways, bridges, or public transportation facilities incapable of handling the volume of traffic flow into or through the area, . . ."

The evidence presented at trial is simply insufficient to meet the statutory definition contained in the first portion of the statute, 163.340(8)(a) (1987).

The opinion testimony of Mr. Lance Clark carries no weight whatsoever because it was premised upon a misunderstanding of law and a misinterpretation of the statutory definition of "blighted area" which is plainly set forth in *Fla. Stat.* 163.340(8)(a) (1987). See, *Katz v Dade County,* 362 So.2d 277 (Fla. 3d DCA 1979); *State Department of Transportation v Byrd,* 254 So.2d 836 (Fla. 1st DCA 1971). The statute clearly requires that the designated area contain "a substantial number of slum, deteriorated or deteriorating structures *and* conditions which endanger life or property by fire or other causes or one or more of the [listed] factors. . ." *Fla. Stat.* 163.340(8)(a) (1987) (emphasis added). Even if the statute were ambiguous, which it is not, the rules of construction enunciated by our Supreme Court would require a strict construction of the statute against the condemnor. *Baycol, supra.*

Mr. Clark, at trial, could not specifically identify any particular buildings which were "slum, deteriorated or deteriorating". Furthermore, neither of the Growth Management Department studies referred to above nor any other evidence submitted by the CRA identified any such defective structures; to the contrary, those reports indicated that any building deficiencies in the subject area were cosmetic only and that strict code enforcement could have eliminated those deficiencies. No buildings were inspected from the inside and no engineering or structural survey was conducted.

While the Resolution relied upon by the CRA, City of Hollywood Resolution R-79-8, identifies eleven "indicators of debilitating blight" and resolves that the area including the subject properties is "blighted" as defined in *Fla. Stat.* 163.340(8) (1977), that Resolution is not conclusive of the issue in this proceeding against the Defendants herein. A verbatim transcript of that City Commission Meeting, as well as the testimony of a City Commissioner at the time of that clearly show that the City Commission at its meeting on February 7, 1979, did not consider *any* testimony or other evidence supporting its factual finding that the area was "blighted" at that time as defined in the Florida Statutes. The evidence also established that a workshop held by the City Commission on October 17, 1978, at which the 1977 and 1978 studies of the Growth Management Department were presented to the

164

City Commission, was advertised as a hearing on zoning, but did not give notice that the City was considering the passage of a Resolution declaring the area to be "blighted". Insofar as it relates to this eminent domain proceeding, due process requires that the factual findings made by the City Commission as recited in Resolution R-79-8 be based on factual information submitted at a public hearing at which the defendants/property owners have an opportunity to be heard and to present contrary evidence and cannot be based upon independent or prior knowledge of the City Commissioners which is not subject to open debate at a properly advertised public hearing. See *Fla. Stat.* 163.355 (1987), *Fla. Stat.* 166.041; *Thorn v Florida Real Estate Commission,* 146 SO.2d 907 (Fla. 1962); *DeGroot v Sheffield,* 95 SO.2d 912 (Fla. 1957); *Ammerman v Florida Board of Pharmacy,* 174 So.2d 425 (Fla. 3d DCA 1965).

Even assuming, arguendo, that due process requirements had been met, Resolution R-79-8 does not prevent this Court from reviewing the factual basis upon which it purportedly rests, i.e. the 1977 and 1978 studies prepared by the Growth Management Department, as testified to by Mr. Clark at trial. The Court has reviewed those studies in detail and concludes that those reports do not contain a factual basis for a conclusion that the area defined in Resolution R-79-8 is "blighted" as defined in *Fla. Stat.* 163.340(8)(a). In particular, those reports establish the following:

(1) Of the 5,100 building units within the central city area, less than one percent were classified as deteriorated (Plaintiff's Exhibit I at Page 1, Paragraph 3);

(2) 96.4% of the buildings in the area exhibited sound conditions or minor cosmetic maintenance problems (43.6% and 52.8%, respectively) *(Id* at Page 2, Paragraph 2);

(3) Within the commercial core, no buildings were evaluated as deteriorated and only 5% of the lots were substandard *(id* at Page 20, Paragraph 2);

(4) Generally, the residential neighborhoods in the study area were well maintained and landscaped, with only isolated instances of neglect *(Id* at Page 4, Paragraph 3);

(5) A survey of building and lot conditions showed that the majority of buildings *and* lots were in relatively good shape (in need of little or no maintenance), some area merely exhibiting a lack of routine maintenance, although the central area (where the subject properties are located) was less critical *(Id* at Page 1, Paragraph 5);

(6) Strict code enforcement could eliminate most of the building and

**165**

lot maintenance problems in the central city *(Id* at Page 20, Paragraph 5).

Clearly, the reports establish that there was *not* a "substantial number of slum, deteriorated or deteriorating structures" within the purportedly "blighted" area delineated in Resolution R-79-8, an area containing in excess of 100 square city blocks.

The area delineated by the City Commission in Resolution R-89-8 as a "blighted area" is bounded by Johnson Street on the north, 14th Avenue on the east, Washington Street on the south, and 22nd Avenue on the west, and, as previously stated, is in excess of approximately 100 city blocks in overall size. The infirmity in this delineation is that it is far too expansive. Subsequent studies could be used to find that more limited areas within the City of Hollywood are "blighted areas" as defined in subsection (8)(a) of *Fla. Stat.* 163.340 (1987); however, that circumstance is not presently before the Court. The testimony with regard to the specific block at issue in this proceeding was that there are no "slum, deteriorated or deteriorating structures" located therein. This would not, however, preclude the taking if the overall area in issue met the criteria in the statute discussed above. Also *Fla. Stat.* 163.361 permits the deleting of parcels; with notice and findings however there may be some question about whether that could be accomplished without the re-establishment of the CRA and all of the procedural requirements and delays associated therewith.

The CRA places considerable emphasis and reliance upon *Berman v Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954). The Court is not in disagreement with the principles of law enunciated in the *Berman* case although the facts of that case clearly distinguish it from any application to the case now before this Court. The facts before the Court in *Berman* made reference to "people who live like they are being reduced to the status of cattle" and conditions that make living an insufferable burden. These conditions do not exist in the instance case, nor do the conditions in this case rise to the factual level recited in *State v Miami Beach Redevelopment Agency,* 392 So.2d 875 (Fla. 1981).

At best, the 1977 and 1978 Growth Management Department studies relied upon by the City Commission in its passage of Resolution R-79-8, as well as by the CRA at trial, establish that there are some unidentified deteriorating structures in the overall area and that there "exists faulty or inadequate street layout" and traffic flow problems along Dixie Highway, Hollywood Boulevard, and U.S. 1 around and approaching Young Circle.

166

Turning now to subsection (8)(b) of *Fla. Stat.* 163.340, the Court notes that the subject properties all front on Hollywood Boulevard adjacent to Young Circle and its intersection with U.S. 2, an area which the Growth Management Department studies show would meet the definition of "blight" as set forth in *Fla. Stat.* 163.340(8)(b), although it does not appear to the Court that the entire area delineated in Resolution R-79-8 could be determined to be a "blighted area" under this subsection of the statute in light of the predominance of single-family residences throughout the area which show little, if any, traffic flow problems.

Even assuming, however, that the area immediately adjacent to Hollywood Boulevard and Young Circle, i.e. the block in which the subject properties are located, is "blighted" as defined in subsection (8)(b) of *Fla. Stat.* 163.340, the CRA did not present any evidence that it is reasonably necessary to acquire any and all of the subject properties for the purpose of remedying "faulty or inadequate street layout"; "inadequate parking facilities"; or to facilitate "traffic flow into or through the area". See *Fla. Stat.* 163.340(8)(b); see also, *Katz, supra.* Additionally, the Court notes that the CRA intends to use this parcel for the construction of a private office building with an even higher user rate than the existing structures if condemnation is permitted. It would appear that, if anything, such a plan would simply compound the existing traffic, congestion and safety problems and would be a use not consistent with the intent of *Fla. Stat.* 163.340(8)(b).

The Court recognizes that there has been considerable time and effort put into the attempted revitalization of the City of Hollywood by public officials and staff and it may well be that more recent studies may serve as a basis for designating more limited areas as "blighted areas" as defined in *Fla. Stat.* 163.340(8) (1987). That matter, however, is not now before this Court.

It is the Court's conclusion that the 1977 and 1978 Growth Management Department studies do not support a finding by the City of Hollywood, the CRA or this Court that the 100 square block area delineated in Resolution R-79-8 is a "blighted area" under *Fla. Stat.* 163.340(8)(a) or 163.340(8)(b). Accordingly, the enabling resolutions of both the City of Hollywood and the CRA constitute an abuse of discretion.

The Defendants also raise as a defense to the taking that the CRA intends to put the property to a private use through a private developer for the construction of an office tower to be occupied primarily by Barnett Bank. However, it is clearly established in the case law that if

167

the CRA could establish that the necessity for the taking is to eliminate or prevent the development of blight in the area, the ultimate private use of the property does not defeat a taking. *State v Miami Beach Redevelopment Agency,* 392 So.2d 875 (Fla. 1981). Likewise, the fact that the properties sought to be condemned in this proceeding are not themselves blighted does not, standing alone, defeat the power of eminent domain. However, the desire of the CRA to put the property to a more intensive use or to develop it to what the CRA views as its maximum potential in an attempt to revitalize the local economy, in and of itself, does not justify, in Florida, the use of the power of eminent domain. *Adams v Housing Authority of City of Daytona Beach,* 60 So 2d. 633 (Fla. 1952). And even if it did, the designated developer for the subject site has pulled out and testimony was presented to the effect that the project may not be feasible today in light of increased interest rates. The CRA's redevelopment plan requires a bona fide, guaranteed private redevelopment before condemnation would be authorized.

Accordingly, it is

ORDERED and ADJUDGED that the Defendants' Motion to Dismiss is hereby granted and the CRA's Petition in Eminent Domain is hereby dismissed without prejudice as to the refiling of an Amended Petition. In the event the CRA declines to file an Amended Petition within twenty (20) days, this case will be dismissed with prejudice, the Court reserving jurisdiction on damages, costs and attorney's fees incurred by the named Defendants.

The Court will entertain timely Motions for Rehearing by either party.

DONE and ORDERED in Chambers at Fort Lauderdale, Broward County, Florida, this 20th day of June, 1989.